ELIZABETH MCSPEDON, Respondent, *v.* ALBERT KUNZ et al., Respondents, and ARMOUR & COMPANY, Appellant.

(Argued April 21, 1936; decided May 19, 1936.)

*Irvin E. Klein* for appellant.

*Myron J. Shon* for plaintiff and defendant, Rubin Brothers, respondents.

CRANE, Ch. J. Elizabeth McSpedon, the plaintiff, lived with her husband and two children at Hastings in Westchester county. They were humble folk and she had to do the cooking and housework.

For years she had dealt with the butcher in the neighborhood named Albert Kunz. Kunz bought his meat from Rubin Brothers who in turn purchased it from Armour & Company of Chicago. On the 20th day of October, 1931, the plaintiff purchased from Kunz four pork chops which she fried on a gas stove. They were about half an inch thick, and she cooked them in a big frying pan until she thought they were well done. After eating the pork chops she was poisoned and developed a disease known as trichinosis. Trichina, or trichina spiralis, is a worm, a parasite found in pork. It is about one and four-tenths of a millimeter long, the female being larger and about three or four millimeters long. Trichinae are found in rats, pigs, dogs, polecats and monkeys. Two or three per cent of all fresh pork, or pigs cut up for consumption, are infected with these little parasites. They render food or the pig meat unwholesome, causing the disease known as trichinosis. Trichinae cannot be seen with the naked eye but, as they infest the muscles, can readily be discovered and seen with the microscope.

In *Rinaldi* v. *Mohican Co.* (decided in this court in 1918, 225 N. Y. 70) the veterinary of the State Department of Agriculture, and a graduate of Cornell Veterinary College, Eugene J. Sullivan, testified to the inspection which could be made to discover trichinae and which at that time was made by government inspectors: " They have a sort of an instrument with a hook on the end of it, something like a fish hook, they go around and stick that in several muscles and bring out parts of muscle and treat it with caustic potash and put it under the microscope and examine it to see if they can find parasites or trichinae, that is the examination for trichinae."

This method of discovering trichinae is known to all the slaughterers and packers. In this case now before us the evidence shows this well-known infection of two or three per cent of fresh pork. Armour & Company knew it. The company also knew the method to discover it as well as the method to kill or eradicate the parasite.

If these pork chops had been cooked to 137 degrees Fahrenheit, the heat would have destroyed the little worms, but the chops that Mrs. McSpedon was cooking on the gas stove would have had to be cooked for twenty minutes or more at this degree of heat until the heat reached the center of the chops. This housewife testified that she knew nothing about the requisite degree of heat or about trichinae; all she knew was that the chops should be well cooked, and she fried them in her pan until she supposed they were well cooked. What would any ordinary housewife do? She buys meat at reputable butchers, supposing it fit to eat after being cooked in the customary way and manner. The expert in this case testified that he did not know these things until he had been taught them in the professional school after he had graduated from college. Of course Armour & Company could not cook the chops. They were shipped and packed for sale to retail butchers. Armour could, however, freeze the chops or the fresh pork to five degrees above zero and kill all these little worms or trichinae. The process was well known to the trade and Armour & Company. It in no way injured the edible quality of the pork; in fact the defendant's manager states that some of the pork was treated in this way. As to freezing and the effect of it upon the meat, the testimony shows that after killing, all meat is stored in a refrigerator at a temperature of thirty-two degrees, which is freezing point.

William J. Grace, the superintendent of Armour's plant in Jersey City, testified that there was no inspection at Armour's plant for trichinae. They let the meat go out to the public without making any effort whatever

to discover its infection by this parasite. He also said that if the fresh pork were placed in refrigeration at five degrees above zero for a period of twenty days all the parasites would be killed. " Q. Now, I ask you, does Armour & Company do that with their pork? A. Some of it.

" Q. They don't do it with all of it? A. No.

" Q. What is the government requirement? A.  *  *  * Pork that is to be eaten by the consumer without being cooked must be subjected to certain rules and regulations, one of which is it must be kept under refrigeration for twenty days at a temperature of 5 degrees or lower. *  *  * What I meant to say is pork eaten without further processing, for instance, bologna.

" Q. Pork chops, that is supposed to be cooked before eating? A. That is correct.  *  *  * Pork chops are cooked by the housewife or by somebody home before they are eaten."

He further testified that if pork is frozen at a temperature of five degrees above zero it does not change the palatability of the pork. On recross-examination, regarding pork chops he gave this testimony:

" Q. You say, pork chops are not so frozen, is that right? A. Well, at times they are, but not for the purpose of destroying trichinae, not under governmental rules. The Government don't require pork chops to be frozen."

The reason for referring to this testimony of the superintendent is to show that trichinae can be destroyed by a method well known to Armour & Company and which is used in treating some of the pork chops which it sells; that the company sends this fresh pork out to the public without any notice that it has not been treated or frozen to the destroying point, or any caution to cook the meat to above 137 degrees Fahrenheit and to cook it long enough to carry this heat through the center of the meat. This requisite of thorough heating and the nature of

trichinae may seem very simple things to us and to experts who are dealing with these matters daily, but there are many people in this country who know nothing about trichinosis or the danger lurking in meats or the requisite heating point to destroy parasites, and who must rely and do rely upon the grocer and the butcher and such reputable concerns as Armour & Company to sell them wholesome food.

This is the reason why we said in the *Rinaldi* case that on every such sale of food by a dealer for immediate human consumption there is an implied warranty of its wholesomeness. I quote the words of Judge ANDREWS in that case to show that we have heretofore squarely passed upon this question of implied warranty and the liability of the seller under just such circumstances as we have here:

" Such is the case before us. On December 16th, 1915, the plaintiff bought a loin of pork at a market owned by the defendant. The meat was infested with trichinae. She cooked and ate it and was made ill. The action was brought to recover for the resulting damages. It was not tried on any theory of negligence or fraud but upon that of implied warranty. The jury found a verdict for the plaintiff and the judgment has been affirmed in the Appellate Division. The plaintiff found no defect in the meat. The court submitted to the jury the question as to whether she could have found such a defect if she had used reasonable care. And finally the defendant insists strenuously that no such defect could have been discovered.

" There is no question but what such an action for damages caused by the breach of the implied warranty with regard to food may be maintained, at least by him to whom the warranty is made " (p. 75).

In fact, the *Rinaldi* case on the evidence was not as strong as this, for in that case the defendant proved that the government inspectors had examined the pork for trichinae and had given the pork their stamp of approval. In this case the defendant relies solely upon the fact that

the Federal government has discontinued the examination for trichinae and deems that a sufficient answer to our statute regarding implied warranty. (Pers. Prop. Law; Cons. Laws, ch. 41, § 96.) If the government withdrew all its inspectors would the defendant be justified in selling any kind of impure or diseased meat?

We should not reverse or attempt to weaken the authority of our *Rinaldi* case. Judge ANDREWS' opinion had the approval of the entire court. Our statute of implied warranties was passed for the very purpose of protecting and safeguarding the life and health of people like Mrs. McSpedon and her little family, and especially should this protection be afforded when there is a well-known means for the detection of trichinae in pork and a well-known method of killing the parasite before the pork is put upon the market.

It may be appropriate at this point to state that the plaintiff brought action against Kunz, the butcher; Rubin Brothers, the middle man, and Armour & Company, the slaughterer and packer. Judgment was given against Kunz for a small amount, with recovery over against Rubin Brothers, and recovery over by them against Armour & Company. Rubin Brothers assigned their judgment to the plaintiff, which is the reason why she is the respondent in this court.

The judgment should be affirmed, with costs.

LEHMAN, J. (dissenting). The plaintiff, claiming to have become infected with the disease known as trichinosis, by eating pork chops which contained trichinae, has recovered a judgment for the consequent damages against the retail dealer from whom she purchased the chops. That dealer impleaded the wholesale dealer who sold the chops to him and recovered judgment over against the wholesale dealer. The wholesale dealer impleaded Armour & Company, the packer of the pork, and recovered judgment against it. The packer alone has appealed from the judgment.

The trial judge has found " that the defendant Armour & Company was not negligent in the preparation of said loins of pork and pork chops." Upon this record the court could not find otherwise, for it appears by uncontradicted evidence, and the trial court has found, that "Armour & Company prepared its loins of pork in conformance with the general usage and universally approved practices of the packing industry in the United States." (Cf. *Ketterer* v. *Armour & Co.*, 247 Fed. Rep. 921.) The evidence shows that many hogs are infected with the parasites known as trichinae, and the court has found that " there is no known practical method by which trichinae may be discovered in slaughtered hogs." For that reason the United States government has discontinued the practice of examining with a microscope the carcasses of hogs in an endeavor to discover the presence of trichinae. Here the pork was approved by the United States government inspectors. True, trichinae in the pork could be destroyed by cooking or by keeping the meat for twenty days under refrigeration at a temperature of five degrees or lower; but in the meat industry where pork is sold in its raw state to be cooked by the purchaser before it is used, it is not subjected to freezing in advance. No contention is now made that failure of Armour & Company to freeze the pork before sale constitutes negligence, and there is no exception in the record to the finding that Armour & Company was not negligent.

Since the court has found that Armour & Company was not negligent, it can be held liable for the damage which resulted from the presence of trichinae in the pork they prepared and sold only if Armour & Company warranted that the pork was free from parasites. In that regard the court has found that the pork " was infected with a disease known as trichinosis and was therefore not of a merchantable quality and was unfit for human consumption by reason thereof." The court also found that Armour & Company warranted that the goods it

sold were of a merchantable quality. That upon the sale of the pork by Armour & Company there was an implied warranty that the pork was of merchantable quality is clear. (Pers. Prop. Law, § 96; Cons. Laws, ch. 41.) The question in the case is whether the presence of trichinae renders pork "unmerchantable." (Cf. *Rinaldi* v. *Mohican Co.*, 225 N. Y. 70.)

In that case a recovery was sustained against a retail dealer for damages resulting to the purchaser from eating pork infested with trichinae, upon the theory that a dealer who sells meat for human consumption ordinarily impliedly warrants that the meat is fit to be used for food. Any distinction between a warranty that pork is merchantable or that it is fit for human consumption is unsubstantial. We draw no such distinction. The retail dealer's warranty to his customer that food purchased for immediate use is fit for human consumption and the packer's warranty upon a sale by description that the pork is merchantable, are substantially alike.

In the *Rinaldi* case, however, this court did not pass upon the question whether the evidence showed that the pork was, in fact, unfit for human consumption because it contained trichinae. Upon the appeal to this court the unanimous decision of the Appellate Division that there was evidence to sustain the verdict of the jury was not subject to review. In this case we must pass upon that question. Here there is no evidence or finding that the pork was unwholesome or unmerchantable for any reason other than that trichinae were present. The pork when sold was raw, and as the court has found, it was not fit for human consumption in a raw state. The court has also found that the plaintiff knew that eating raw pork chops or raw pork which is not well cooked might cause illness. The pork was sold to be eaten when cooked. The evidence establishes, and the court has found, that "if raw pork containing trichinae is heated to 137 degrees Fahrenheit all the trichinae will be destroyed and the

pork remains wholesome and fit for human consumption " and that " it was impossible for Elizabeth McSpedon to have contracted trichinosis by eating said pork chops if same had been cooked at a temperature of 137 degrees or over."

Thus, it appears not only that the pork was prepared by the packer with all the care that is customarily used by packers, but also that the presence of the parasites could not be discovered in the exercise of reasonable care, and rendered the meat unwholesome only if it was not heated to 137 degrees. A similar condition exists not infrequently in pork products, but becomes harmless when the pork is well cooked. The pork was not unmerchantable or unwholesome unless it was intended for human consumption without being well cooked and heated to 137 degrees.

The court refused to find that " in the ordinary usage and in the course of trade raw pork loins and raw pork chops are not intended to be fit for human consumption in such state;" yet the evidence, read in the light of common knowledge, conclusively establishes that proposed finding. " The warranty in the present case was not that the food was fit to eat without cooking, but that it was fit to eat after ordinary domestic cooking." (Holt v. Mann [Supreme Judicial Court of Mass., Feb. 28, 1936], 200 N. E. Rep. 403.) In that case there was evidence that the ham was cooked for three hours and the court said " it could have been found that the ham was cooked as thoroughly as could be expected in a family, but without killing trichinae with which it was infested." For that reason the court found that there was a breach of warranty. Here there is no evidence or finding that the pork was cooked as thoroughly as could be expected. Without such finding there is no basis for a conclusion that there was any breach of warranty by the packer.

The packer is not an insurer of the wholesomeness of raw pork. It is not bound to cook pork before sale or to freeze it so as to kill trichinae when ordinary cooking

will destroy the trichinae. The packer impliedly warrants · that goods sold by description are fit for their intended purpose and, therefore, merchantable. Its warranty does not extend to the wholesomeness of raw pork when the pork is intended for ordinary cooking. " Fresh pork is not ordinarily intended to be eaten raw. The warranty should be applied only to food used in the usual, rather than in the unusual and improper manner." (*Cheli* v. *Cudahy Bros. Co.*, 267 Mich. 690.)

The implied warranty of the packer that the pork is merchantable and, therefore, fit for human consumption, is not breached by sale of pork prepared in the usual manner approved in the industry, salable in the usual way and not unfit for human consumption if used in the manner in which the packer might reasonably expect it to be used and for which it was intended. The warranty may be breached where pork sold is unfit for human consumption without cooking and the packer has notice that it is intended to be used in the condition in which it is sold (Cf. *Gindraux* v. *Maurice Mercantile Co.*, [Cal.] 47 Pac. Rep. [2d] 708), or where it remains unwholesome in spite of cooking in the ordinary manner. (*Holt* v. *Mann, supra; Rinaldi* v. *Mohican Co., supra.*) In this case there is no finding that the pork was unwholesome if cooked in the ordinary manner and no evidence which would justify such a finding. Without such a finding no judgment against Armour & Company can be sustained.

The judgment should be reversed and a new trial ordered, with costs to abide the event.

HUBBS, LOUGHRAN and FINCH, JJ., concur with CRANE, Ch. J.; LEHMAN, J., dissents in opinion in which O'BRIEN and CROUCH, JJ., concur.

Judgment affirmed.