ISIDORE VACCARINO *v.* JOSEPH COZZUBO

[No. 54, January Term, 1943.]

*Decided April 8, 1943.*

The cause was argued before SLOAN, C. J., DELAPLAINE, COLLINS, MARBURY, GRASON, MELVIN, and ADAMS, JJ.

*James C. Burch* and *L. Wethered Barroll* for the appellant.

*Palmer R. Nickerson* and *Gordon G. Power,* with whom were *Due, Nickerson & Whiteford* on the brief, for the appellee.

DELAPLAINE, J., delivered the opinion of the Court.

Joseph Cozzubo, of Baltimore, instituted this suit on contract against Isidore Vaccarino, a retail dealer operating a grocery and meat store on South High Street in Baltimore, to recover damages caused by a breach of an alleged implied warranty that certain sausage, which was sold by the defendant and eaten by the plaintiff, was wholesome and fit for human consumption. The jury rendered a verdict in favor of the plaintiff for $2,000. Vaccarino is appealing from the judgment entered on the verdict.

On October 22, 1940, Cozzubo's wife gave some money to their daughter, Lucy, eleven years old, and told her to buy some sausage at Vaccarino's store. The little girl bought a pound of Italian-style sausage from Vaccarino, and Mrs. Cozzubo cooked it for supper. Six days later Cozzubo became ill, and several days later his wife and child also became ill. They were removed to a hospital, where their disease was diagnosed as trichinosis. Trichinosis is a disease caused by trichinae, nematodes which are occasionally found in pork and which breed in the human body causing muscular swelling, pain and fever. The disease prevented Cozzubo from returning to his employment as a stevedore, and it was not until nearly a year later that he was able to do even light work.

It was vigorously contended that there was no privity of contract between the plaintiff and the defendant. The law is well settled that an action cannot be maintained on an implied warranty where there is no privity of contract. *Poplar v. Hochschild, Kohn & Co.,* 180 Md. 389, 393, 24 A. 2d 783. Accordingly an implied warranty of wholesomeness of food does not inure to the benefit of any consumers other than the purchaser, for any such consumers have no privity of contract with the seller.

*Flaccomio v. Eysink,* 129 Md. 367, 379, 100 A. 510; *Hanback v. Dutch Baker Boy,* 70 App. D. C. 398, 107 F. 2d 203. But it is the clear legal duty of a husband to support his wife and supply her with necessaries suitable to her situation and his own circumstances in life. It is a fundamental rule of the common law that a wife, while living with her husband, is presumed to have authority from him to purchase the supplies which are ordinarily required for family use. Lord Abinger laid down the rule as follows: "Where a wife is living with her husband, and where, in the ordinary arrangements of the husband's household, she gives orders to tradesmen for the benefit of her husband and family, and these orders are proper and not extravagant, it is presumed that she has the authority of her husband for so doing. This rule is founded on common sense, for a wife would be of little use to her husband in their domestic arrangements if she could not order such things as are proper for the use of a house and for her own use without the interference of her husband. The law, therefore, presumes that she does this by her husband's authority." *Emmett v. Norton,* 8 Car. & P. 560. The presumption that the wife, as manager of the household and agent for her husband, is authorized to purchase necessaries for the appropriate maintenance of the home arises from the fact of their living together, and the presumption may be rebutted only by proof that the purchase was made without his authority, real or apparent, and without his subsequent assent. *Adkins v. Hastings,* 138 Md. 454, 464, 465, 114 A. 288; *Brown v. Durepo,* 121 Me. 226, 116 A. 451, 27 A. L. R. 551, 553. The Maryland Act, which prescribes the mutual rights and liabilities of husband and wife, declares that nothing in the Act shall be construed to relieve the husband from liability for debts or contracts which his wife may incur or enter into upon the credit of her husband or as his agent, or for necessaries for herself or for his or their children; but as to all such cases his liability shall continue as at com-

mon law. Acts of 1898, Chap. 457, Sec. 20, Code, 1939, Art. 45; Sec. 21. In the present case the wife and daughter of Cozzubo were acting as his agents in helping him carry out his obligation to support and maintain the family. We therefore hold that privity of contract did exist between the plaintiff and the defendant.

The principal issue presented on this appeal is whether the trial court properly instructed the jury as to the liability of the storekeeper to the purchaser. The general rule has been established in Maryland and by the weight of authority in the United States that where a retail dealer seels food for immediate domestic consumption, there is an implied warranty that the food is wholesome and fit for the purpose for which it is sold. *Flaccomio v. Eysink*, 129 Md. 367, 381, 100 A. 510, 515. While the rule of *caveat emptor* has generally been applied to the sale of merchandise, the courts have considered the prevention of the sale of unwholesome foods by retail dealers to be of such vital importance to the public health that they have recognized an exception in such cases, holding such a dealer liable on an implied warranty of wholesomeness, even though he did not know it was unwholesome at the time he sold it. It is reasoned that a dealer has more opportunity to ascertain the quality of articles of food offered for sale than is afforded to the purchaser, and it would be for the public welfare to impose upon the dealer the liability of an insurer by means of an inference of law, rather than to make the purchaser assume the risk. Moreover, the law places the responsibility upon the party who is better able to protect himself in case of loss, because the dealer comes in closer touch with growers, slaughterers, packers and manufacturers. *Wiedeman v. Wheeler*, 171 Ill. 93, 49 N. E. 210, 13 *A. L. R.* 1176; *Ryan v. Progressive Grocery Stores*, 255 N. Y. 388, 175 N. E. 105, 74 *A. L. R.* 339; *Flessher v. Carstens Packing Co.*, 93 Wash. 48, 160 P. 14; *S. H. Kress & Co. v. Lindsey*, 262 F. 331, 13 *A. L. R.* 1170.

The Uniform Sales Act, adopted by the Maryland Legislature in 1910, provides: "Where the buyer, expressly or by implication, makes known to the seller the particular purpose for which the goods are required, and it appears that the buyer relies on the seller's skill or judgment (whether he be the grower or manufacturer or not), there is an implied warranty that the goods shall be reasonably fit for such purpose." Acts of 1910, Chap. 346, Code, 1939, Art. 83, Sec. 33 (1). In the case of the sale of food by a retail dealer for immediate consumption, the Sales Act is declaratory of the common law holding that there is an implied warranty that the food is reasonably fit for the purpose. *Child's Dining Hall Co. v. Swingler,* 173 Md. 490, 495, 197 A. 105, 107. The Act broadens the law by imposing an implied warranty in the case of the sale of goods other than food. While the Act declares there is no implied warranty as to quality or fitness except where the buyer expressly or impliedly acquaints the seller with the purpose of the purchase and relies on the seller's skill or judgment, it is recognized by the courts that whenever an article ordinarily used for food is purchased from a retail dealer the purchase in itself makes known by implication the purpose for which the article is bought, and the fact that it is bought for immediate consumption is sufficient evidence to establish the buyer's reliance on the seller's skill and judgment. Undoubtedly a buyer who does not himself select the article of food may rightfully assume that it is in fact suitable for the purpose. *Greco v. S. S. Kresge Co.,* 277 N. Y. 26, 12 N. E. 2d 557, 115 *A. L. R.* 1020; 4 *Williston on Contracts,* Rev. (1936) Ed., Secs. 995, 996; 22 *Am. Jur., Food,* Sec. 96.

The Sales Act further provides that when goods are bought by description from a seller who deals in goods of that description, there is an implied warranty that the goods shall be of merchantable quality. Code, Art. 83, Sec. 33 (2). After the adoption of the Act by the

New York Legislature, Chief Judge Cardozo declared in the Court of Appeals of New York: "Dealer as well as manufacturer or grower affirms as to anything he sells, if purchased by description, that it is of merchantable quality. The burden may be heavy. It is one of the hazards of the business." *Ryan v. Progressive Grocery Stores*, 255 N. Y. 388, 175 N. E. 105, 106. It is absolutely clear that there was an implied warranty in this case that the sausage was of merchantable quality and reasonably fit for human consumption.

However, no implied warranty arises either at common law or under the statute that meat, generally fit to be eaten only when properly cooked, is wholesome when eaten raw or cooked in an unusual or improper manner. It is a matter of common knowledge that pork is purchased to be eaten when cooked, not when raw. Hence, it would be unfair to impose upon a retail meat dealer an implied warranty that his pork is fit to be eaten when raw. This is especially true in view of the fact that the danger of contracting trichinosis from eating pork can be eliminated by means of proper cooking. Ferdinand A. Korff, inspector in the Bureau of Meat Inspection of the Baltimore City Health Department, testified in the court below: "There are generally five ways to prevent trichinosis. The first one is to stop feeding garbage to hogs. The second is to cook the garbage. The third is to refrigerate all the pigs for a long period of time at a very cold temperature, about five degrees, for about twenty-one days. The fourth is, of course, to cook all pork products thoroughly, which every housewife should do. And the fifth is by an antigen test, which isn't such a good way. * * * The best way is, of course, cooking the pork thoroughly until all portions of the meat are heated up to 150 degrees. That isn't high, but that's enough to destroy the parasite, if the meat is heated. The Federal requirements say 137 degrees; that's the killing point. But we recommend 150 degrees; so that if you cook your pork twenty minutes per pound, and

are very sure to get all the redness out of the meat, the parasite will be destroyed." It is not necessary, of course, for the plaintiff, who has been infected by eating pork, to prove that the pork was cooked at a specific temperature or for a specific length of time. It is our opinion, however, that the implied warranty in the case before us was not that the sausage was wholesome and fit to be eaten either cooked or raw, but that it was wholesome and fit to eat after ordinary domestic cooking. *Holt v. Mann,* 294 Mass. 21, 200 N. E. 403; *Cheli v. Cudahy Bros. Co.,* 267 Mich. 690, 255 N. W. 414, 416; *Zorger v. Hillman's,* 287 Ill. App. 357. 4 N. E. 2d 900; *McSpedon v. Kunz,* 271 N. Y. 131, 2 N. E. 2d 513, 516, 105 *A. L. R.* 1497.

At the trial of this case the court instructed the jury that if they found that the plaintiff was infected with trichinosis as a result of eating the sausage, the verdict should be for the plaintiff. The jury should have been authorized to give a verdict for the plaintiff only in case they found that the plaintiff was infected with trichinosis by eating the sausage after it was cooked in the usual or proper manner. The judgment entered in favor of the plaintiff must therefore be reversed.

*Judgment reversed, and new trial awarded, with costs.*