**Edward B. KOBECKIS, Plaintiff,**

**v.**

**Richard BUDZKO, d/b/a Dick's Corner Store, Defendant and Third-Party Plaintiff,**

**v.**

**B. D. STEARNS, INC., Third-Party Defendant and Fourth-Party Plaintiff,**

**v.**

**DUBUQUE PACKING COMPANY, Fourth-Party Defendant.**

Supreme Judicial Court of Maine.

Jan. 4, 1967.

Basil A. Latty, Franklin F. Stearns, Jr., Portland, for plaintiff.

William B. Mahoney, and Hollis J. Allen, Portland, for Richard Budzko.

Edward J. Berman, Portland, for B. D. Stearns, Inc.

Herbert H. Sawyer, Portland, for Dubuque Packing Co.

Before WILLIAMSON, C. J., and WEBBER, TAPLEY, MARDEN, RUDMAN and DUFRESNE, JJ.

MARDEN, Justice.

On appeal from summary judgment for defendants.

The plaintiff complained breach of implied warranty of merchantable quality and fitness for human consumption of pork purchased from defendant on or about April 15, 1961, and from the consumption of which he alleged resultant trichinosis.[1]

1. A disease caused by the infestation of the body with worms of the genus trichinella spiralis. Man acquires the disease by eating infected pork which has not been cooked sufficiently. Schmidt's Attorneys' Dictionary of Medicine.

Larvae of the trichinae are in the muscle tissue of the infected meat encysted, but still alive. The disease is transmitted to man by his eating uncooked pork which contains these larvae. The encysted walls are digested by the gastric juice liberating the larvae which attach themselves to the lining of the upper intestinal tract. Here they mature, the female worms become fertilized and deposit their larvae. These larvae pass into the regional lymph nodes and reach the heart by way of the thoracic lymph duct from which point they are disseminated through the blood stream to all body tissues and organs, "the brain being particularly susceptible." The mortality rate once 20% appears to be now about 8% (as of 1964) due to earlier diagnosis and treatment. "Prevention of trichinosis in man is specifically preventable by thorough cooking of pork or any other possibly infected meat. Meat which is inspected in accordance with federal regulation is not inspected for the presence of trichinae. Efforts to inspect pork for the presence of trichinae were abandoned years ago by the Department of Agriculture because of the fact that no technique for detection was sufficiently accurate to remove all infected animals * * *. Destruction of encysted larvae in pork has been largely accomplished by thorough cooking, or by curing or refrigeration. Refrigeration of pork for twenty days as prescribed by federal regulations has been effective.

Under third party practice, provided by Rule 14 M.R.C.P., defendant Budzko impleaded defendant B. D. Stearns, Inc., as one responsible to him if liability were imposed upon him and Stearns, in turn, impleaded defendant Dubuque Packing Company, upon the same basis.

From pre-trial, and recorded in the pretrial order, is a stipulation in which all parties joined:

"That the Plaintiff claims that his evidence will establish that he became infected with trichinosis as a result of tasting pork which is the subject of the present controversy, uncooked and in its raw state. It is the Plaintiff's contention that it is the custom in the making of Polish sausage to taste it for flavoring periodically in its raw state, which custom, plaintiff alleges, was well known to the Defendant." [1a]

Seasonably thereafter defendant Budzko filed a motion for summary judgment (Rule 56 M.R.C.P.) upon the ground that the pleadings and stipulated facts showed that he was entitled to judgment as a matter of law. Upon the same day third party defendant Stearns and fourth party defendant Dubuque filed a similar motion upon the ground that plaintiff was not entitled to judgment against Budzko as a matter of law, and consequently no judgment could be granted against either of them. Upon these motions, summary judgment for all defendants was granted and appeal followed.

Plaintiff briefs his position as based upon Section 15(1) of the Uniform Sales Act (then Chapter 185 R.S.1954, now included within the Uniform Commercial Code under 11 M.R.S.A. § 2–315).

Section 15, reads as follows:

"*Sec. 15. Implied warranties of quality.*—Subject to the provisions of this chapter and of any statute in that behalf, there is no implied warranty or condition as to the quality or fitness for any particular purpose of goods supplied under a contract to sell or a sale, except as follows:

"*I.* Where the buyer, expressly or by implication, makes known to the seller the particular purpose for which the goods are required, and it appears that the buyer relies on the seller's skill or judgment, whether he be the grower or manufacturer or not, there is an implied warranty that the goods shall be reasonably fit for such purpose."

This section, when applicable, imposes a warranty of "fitness for the disclosed purpose." An implied warranty of "merchantable quality" is imposed under Section 15 (2) where goods are bought by description. Section 15(2) is not in issue.

■ This statute changed the common law rule of caveat emptor, except as to title, in Maine, to a rule imposing an implied warranty of quality under specified conditions. This statute "measures the buyer's right of recovery and the seller's liability." Ross v. Porteous, Mitchell & Braun Co., 136 Me. 118, 122, 3 A.2d 650, 653.

"In order to recover upon an implied warranty [under this statute] * * * the burden is upon the plaintiff to establish (1) that he made known to the seller the particular purpose for which the goods were required, (2) that he re-

Rapid freezing at —35° C or freezing and storage for three days at —18° C has been reported to be equally effective. The use of x-rays or gamma rays, using cobalt 60 radiation, will render the larvae incapable of reproducing themselves." Attorneys' Textbook of Medicine 3rd Ed. Gray, Paragraphs 41.72–41.72(2) inclusive, Trichinosis, with Supplement through 1964. See also Public Health Reports April, 1963 Page 417 et seq., Trichinosis; same February, 1959, Page 159 "Trichinosis in the United States."; "Products Liability," Frumer and Friedman § 21.04(8).

1a. Taste: "To eat a small amount of." Webster's New World Dictionary, College Ed.

lied upon the seller's skill or judgment, (3) that he used the goods purchased for the particular purpose which he made known to the seller, (4) that the goods were not reasonably fit for the purpose disclosed to the seller, and (5) that he suffered damage by breach of the implied warranty." Ross v. Diamond Match Company, 149 Me. 360, 362, 102 A.2d 858, 859.

■ Testing, by the statute, plaintiff's position in the light most favorable to him and by combining his complaint with the pre-trial stipulation, it is represented that on the date in question he purchased pork from the defendant Budzko "informing defendant that such was to be used in making sausage for human consumption" (from complaint) and "that it is the custom in the making of Polish sausage to taste it (pork) * * * in its raw state, which custom * * * was well known to the defendant (from pre-trial order)." An implication, under the statute, from the fact of purchase, that the pork was intended for human consumption is logically established. Silverman v. Swift & Co. (1954) 141 Conn. 450, 107 A.2d 277, [3, 4], 279; Baum v. Murray (1945), 23 Wash.2d 890, 162 P.2d 801 [4], 804; "Such a transaction standing by itself permits no contrary inferences" Rinaldi v. Mohican Co. (1918) 225 N.Y. 70, 121 N.E. 471 [5–7], 472. See also Sams v. Ezy-Way Foodliner Co., 157 Me. 10, 21, 170 A.2d 160. Here the buyer expressly made known that the "goods" were purchased for human consumption.

■ From the allegation that the plaintiff informed the defendant that he proposed to use the pork for the making of sausage for human consumption he continues by innuendo to charge the defendant with additional knowledge that a) he meant "Polish" sausage and b) that the making of such sausage customarily involved the ingestion by plaintiff of some of the pork in its raw state and that from such pleading the law implies, and the defendant is bound to infer, the "particular purpose" for which the pork was required. Plaintiff seeks to charge the defendant with the inference that because he was buying pork for sausage he meant only "Polish" sausage, with the concomitant custom of tasting it uncooked. The only fact in the record from which the defendant Budzko could infer that the purchaser contemplated making "Polish" sausage, is plaintiff's name, which, while the name may be Polish, leaves the pleading only as a basis for speculation.

The significance of this deficiency goes to the *particular* purpose which plaintiff made known to Budzko. A statutorily imposed implication that the pork was to be used for human consumption is one thing, but that it was to be used for the making of Polish sausage in the process of which defendant knew that it would be tasted,—and swallowed, uncooked is an entirely different matter.

> "When the buyer makes known to the seller the manner in which the goods are to be used for the particular purpose for which they are required, *such manner of use forms a part of the disclosed particular purpose for which the goods are required.* In such case the implied warranty that the goods shall be reasonably fit for the disclosed purpose is conditioned upon their use in the manner disclosed by the buyer to the seller." *Ross,* supra, 149 Me. at 362, 102 A.2d at 859.

As applied to raw pork, see Cheli v. Cudahy Bros. Co. (1934) 267 Mich. 690, 255 N.W. 414 [6–8], 416.

■ There is nothing in the record to establish by implication that the plaintiff made known to Budzko that he required this pork for human consumption in its raw state. The plaintiff-buyer did not expressly or by implication, make known to the defendant-seller the particular (abnormal) purpose for which he required the pork. This deficiency in the record per se supports the summary judgment.

■ This is a case of first impression and we prefer to dispose of it on broader

grounds. Accepting the inference with which defendant was charged, that the plaintiff made known to the defendant that he required the pork for human consumption, and assuming that the buyer-plaintiff relied on the seller-defendant's skill or judgment on choice of the meat, as to which we will comment later, and that there is an implied warranty that the goods shall be reasonably fit for the purpose, what then is the extent of the warranty implied by the terms of the Uniform Sales Act? The statute imposes a warranty not that the goods shall be fit for the purpose disclosed by implication, but that the goods shall be *reasonably* fit for such purpose.

Imposing this warranty as applied to pork and pork products sold in an uncooked state, the unique character of raw pork as it pertains to the defect under consideration must be considered.

The footnote, supra, has described the nature of the trichinosis infection in man and one's first reaction is that it should be the responsibility of the retailer-distributor-packer chain in merchandising to see that pork should enter the market free of the trichinae. A great deal has been written in government publications, law reviews, medical journals and in decided cases, of which the footnote is illustrative[2] to expose, teach and adjudicate the danger of trichinae in raw pork. It has for a number of years been clear that as a practical matter there is no way to assure the public that raw pork is free of the trichinae. The nematodes are microscopic in size and testing pork for the presence of the infection requires microscopic examination of the meat.

The presence of the trichinae in a particular sample establishes only that the infection is present in that specimen and the infection may or may not exist elsewhere in the body of that particular animal. Conversely the absence of the trichinae in a given specimen does not establish that the infection is not present elsewhere in the body of the animal. To establish that a given pork carcass is free from trichinae would involve examination of the entire subject matter, the result of which would leave no saleable meat.

Because of this fact, the federal government as early as 1906 ceased to inspect pork for trichinae, lest such government inspection be accepted as a representation that the meat was free from infection, when in fact no such representation could be made short of destroying the meat in the process.

With the passage of time, it is now stated, with authority, that certain freezing procedures will kill the pork infection, but the cost of such refrigeration has been considered from a merchandising standpoint as prohibitive. Even more recently it is stated, with authority, that treatment of the pork by radiation, while not killing the trichinae, renders the nematodes incapable of reproduction so that ingestion by the host body brings on no new cycle of reproduction with resultant trichinosis. As of this date, it is to be inferred, that such treatment of pork is considered from a merchandising standpoint prohibitive.

■ As a result the public has been the object of teaching that there is a third method of protection from trichinae, namely, that

2. Products Liability and the Food Consumer, Dickerson § 4.4-4.22; Products Liability, supra, § 21.04 [8]; Case note 49 Harvard Law Review 1379; Public Health Reports, supra; Tavani v. Swift & Co., 262 Pa. 184, 105 A. 55; Russell v. First Nat. Stores, Inc., 96 N.H. 471, 79 A.2d 573; Adams v. Scheib, 408 Pa. 452, 184 A.2d 700; Leonardi v. A. Habermann Provision Co., 143 Ohio St. 623, 56 N.E.2d 232; McSpedon v. Kunz, 271 N.Y.

131, 2 N.E.2d 513, 105 A.L.R. 1497; Arena v. John P. Squire Co., 321 Mass. 423, 73 N.E.2d 836; Cheli v. Cudahy Bros. Co., 267 Mich. 690, 255 N.W. 414; Schneider v. Suhrmann, 8 Utah 2d 35, 327 P.2d 822; Ketterer v. Armour & Co., 2 Cir., 247 F. 921 L.R.A.1918D, 798; Feinstein v. Daniel Reeves, Inc., D.C., 14 F.Supp. 167; and Yachetti v. John Duff & Sons Ltd. (1943) 1 D.L.R. 194.

the application of heat in cooking kills the nematodes. This means of protection has been of such general knowledge that in a number of cases the court has taken judicial notice of the fact. See *Silverman*, supra, 107 A.2d 277 [5, 6–9], 281; Meyer v. Greenwood (1955) 125 Ind.App. 288, 124 N.E.2d 870 [2–4], 872; Golaris v. Jewel Tea Co. Inc., (D.C.Ill.1958) 22 F.R.D. 16 [8], 20, and Nicketta v. National Tea Co. (1949) 338 Ill.App. 159, 87 N.E.2d 30 [5], 32, took judicial notice that trichinosis cannot be contracted from "properly" cooked pork. This case, though not from a court of last resort, is frequently cited in the "trichinosis" field.

■ Infection and death resulting from trichinosis have supplied a fertile field of litigation with varying results. Imposition of liability upon those in the chain of supply has been sought upon theories of negligence, either by proof of lack of factual due care or its presumption following the violation of pure food statutes, or under warranties implied by the Uniform Sales Act, or similar statutes. See Annot. 77 A.L.R.2d 7 et seq. While cases grounded upon implied warranty of fitness for human consumption are not uniform in result, a ruling predominates that the implied warranty of fitness for human consumption as applied to uncooked pork and pork products is a warranty that the pork is reasonably fit for human consumption when properly cooked. The usual use of meat as a food is when cooked, not when raw, and while it is beyond question that cooking practices vary and the consumer's taste for meat at various stages of its cooking operation varies, pork is peculiar in its inherent danger when not properly cooked. The ever present possibility of live trichinae in raw pork and raw pork products is as natural an attribute of pork as the presence at time of purchase of bones in fish and chicken and pieces of shell in crustacious sea food. The rule is supported by reason and authority.

■ While cases establishing and adopting this rule seem to place no particular significance on a provision in a statute that the implied warranty of reasonable fitness arises only if it appears that the buyer relied on the seller's skill or judgment, as appears in our statute, this necessary element to the imposition of the implied warranty merits consideration. In the light of the nature of the pork infection, how can it be said that the buyer has legal justification in relying upon the "skill or judgment" of the seller in delivering to him a particular piece of pork free of trichinae? For skill or judgment to be exercised there must be some logical basis for the exercise of skill or the formation of the judgment. The retailer is in an even more impossible position to effectively inspect his pork than the producer and the Federal Department of Agriculture. A retailer possessing the greatest skill and judgment is in no position to represent realistically that the pork in his case is free from trichinae. His skill as a meat cutter and seller, and his judgment based upon marketing experience does enable him to represent that the meat is fresh and free from "foreign" as distinct from "natural" defects, Mix v. Ingersoll Candy Co. (1936) 6 Cal.2d 674, 59 P.2d 144 [3, 4], 148; Brown v. Nebiker (1941) 229 Iowa 1223, 296 N.W. 366 [2], 371, and that properly prepared it will cause no harm. While a jury might find that the buyer, in fact, relied upon the skill or judgment of the seller, we say that as applied to pork and the presence of trichinae, such reliance is not legally justified upon the fact alone of purchase and the resulting implication that it is to be eaten.

While we are engaged in a discussion of trichinosis and are about to adopt a rule that the warranty implied under Section 15(1) of the Uniform Sales Act is that pork and pork products shall be reasonably fit for human consumption only when properly cooked, what is meant by "proper" cooking? Holt v. Mann (1936) 294 Mass. 21, 200 N.E. 403, 404 [5], 405 states that the warranty there as applied to trichinae infected ham was

that "it was fit to eat after ordinary domestic cooking," followed in Vaccarino v. Cozzubo (1943) 181 Md. 614, 31 A.2d 316 [11–13], 319. In *Silverman,* supra, 107 A.2d 277 [1], 279, the trial court concluded, without error, that the warranty was that the pork was fit for food "provided it was properly cooked and the ordinary, commonly used precautions prevailing among the general public in the preparation of fresh pork for human food were observed." Adams v. Scheib (1962) 408 Pa. 452, 184 A.2d 700 [8], 705, holds that the seller warrants the pork or pork product as "wholesome and fit for human consumption *only if it is properly cooked,*" citing cases.

The phrases "ordinary domestic cooking," etc., cited above are no real guide in the cooking of pork and pork products as a premise upon which to found a complaint for breach of implied warranty. As of this date, authoritative sources are uniform in saying that raising the pork or pork product to a temperature of 137° Fahrenheit kills trichinae and "proper" cooking as used in this case means raising the temperature throughout the meat or meat product to a minimum of 137° Fahrenheit.

The warranty implied by Section 15(1) of the Uniform Sales Act (now 11 M.R.S.A. § 2–315 (U.C.C.)) on the sale of uncooked pork and uncooked pork products purchased for human consumption without additional particularity expressed is that the pork or pork product is reasonably fit for human consumption only when properly cooked. Feinstein v. Daniel Reeves, Inc., D.C., 14 F. Supp. 17 [1]; *Silverman,* supra, 107 A.2d 277 [5], at page 281; *Vaccarino,* supra, 31 A.2d 316 [11–13], at page 319; *Cheli,* supra, 255 N.W. 414 [6–8], at page 416; *Adams,* supra, 184 A.2d 700 [8], at page 705; *Holt,* supra, 200 N.E. 403 [5], at page 405. Contra, with qualifications, see Rinaldi v. Mohican Co. (1918) 225 N.Y. 70, 121 N.E. 471, and subsequent New York cases.

Appeal denied.