ERICK DRESSLER and Others, Respondents, *v.* MERKEL, INC.,
Appellant, Impleaded with WILLE EHRING, Defendant.

Second Department, February 28, 1936.

·*Daniel Mungall* [*E. C. Markel* with him on the brief], for the appellant.

*Julian D. Heath*, for the respondents.

Davis, J. Defendant Merkel, Inc., was a wholesale dealer in pork products, sometimes called a " packer," having its principal plant in Jamaica and distributing stores elsewhere. In 1931 the defendant Ehring conducted a small butcher shop in College Point, in Queens. During the month of September he bought pork shoulders and " back fat " from Merkel, Inc., which he manufactured into a sausage known as raw bologna, T-wurst or Mettwurst. It was made by running the meat through a grinder, mixing it, and putting it in a casing. It was then placed on hangers and smoked; but it was not cooked.

The plaintiffs, who join in this action, at different times during September, 1931, bought these sausages from Ehring and soon thereafter fell ill. Their ailments were diagnosed as trichinosis or trichiniasis. This action was brought against Ehring on the theory of warranty that the product was fit for human consumption; and against Merkel, Inc., on the ground of negligence, and further on the ground that the sale was in violation of sections 198 and 199 of the Agriculture and Markets Law.

At the close of the plaintiffs' evidence the complaint was dismissed as to Ehring on the consent of plaintiffs. The trial then proceeded against Merkel, Inc., resulting in verdicts for plaintiffs in varying amounts. We will accept as established by the evidence and by the verdict that the pork sold by Merkel, Inc., to Ehring, and by him manufactured into these sausages, contained the parasite known as " trichina spiralis," and that the plaintiffs became ill, after eating the sausages, of the ailment known as " trichinosis " or " trichiniasis," and each suffered somewhat serious consequences.

Trichinosis is not an uncommon disease; and the source of this infection is practically always from eating uncooked pork. The course of the disease is that after these parasites are taken into the stomach they multiply rapidly in the intestinal tract, causing inflammation and vomiting in the early stages. Then they pass through the intestinal wall into the patient's blood and travel by the blood stream into practically all parts of the body. Within a short time they become embedded in the muscles, chiefly in those of the upper arm and chest; and there they become encysted or covered by a capsule, remaining there usually during the patient's life. The progress of the disease is attended by pain and fever; and after the parasites become encysted they give rise at times

to muscle and joint pains, and somewhat affect the muscular strength of the patient for the rest of his life. The onset of the disease occurs from a few hours to a week after these parasites are taken into the system; and it affects people with different degrees of severity — sometimes resulting in death. These parasites become encysted within a period of from several days to a month. The disease somewhat resembles rheumatism in its action and effects.

These parasites are destroyed by cooking at about 113 degrees, Fahrenheit, and are thereafter harmless in respect to causing any further acute trouble. The parasites are microscopic in size. The meat in the Merkel plant was inspected by a government inspector and each piece was stamped by him; and there was also inspection by the local board of health at the stores; but these latter inspections did not include analysis or other tests of the meat. The foregoing statements are taken from the evidence of plaintiffs; and the facts concerning the disease, and the necessity of cooking pork to prevent its occurrence, are quite well and commonly known.

The proof by the defendant, undisputed and principally by disinterested witnesses, which we also accept, is that proper cooking is the only practical way of destroying this parasite; that all pork which is sold in interstate shipments is inspected by the United States government, as was the pork in this case; and that in the ordinary course of business the government inspectors or the packers do not make inspection for the parasite of trichinæ, for there is no way to make such inspection except microscopically. Inspection for trichinæ efficiently is not possible, for in order to discover these parasites, which may be found anywhere in the body of the pork, it would require microscopic inspection of practically every fiber. Such inspection, if conducted so as to examine seventy-five per cent of the muscles, would not be conclusive, but each muscle would have to be examined microscopically. In fact the only way to discover the presence of these parasites would be to grind up the whole pork product and examine each part with a microscope. The United States government does not undertake to make any such inspection and does not permit any certification of the presence or absence of trichinæ in the hog that is being transported from one State to another or sold by packers or wholesale dealers.

The defendant is charged solely with negligence and with breach of statutory duty in selling pork containing these parasites. As to negligence in the common definition of the term, none has been established. It could not reasonably be foreseen or anticipated,

in selling pork to a butcher in the ordinary course of business, that he would prepare and sell a product of this kind to be eaten without cooking. (See *Cullem* v. *Renken Dairy Co.*, 247 App. Div. 742.) The ordinary standards in the business do not require such excessive care — otherwise, as has been said, it " would require an extent of time and caution that would terminate half the business of the world." (*Loop* v. *Litchfield*, 42 N. Y. 351, 361.) There can be no liability for an act which ordinary human care and foresight could not guard against. (*City of Chicago* v. *Sturges*, 222 U. S. 313, 322.) The results of a given act as constituting negligence must be " not merely possible, but probable." (*MacPherson* v. *Buick Motor Co.*, 217 N. Y. 382, 389.) In cases of this kind involving trichinæ it has been held in courts of other jurisdictions that there could be no liability for negligence under similar circumstances. ·(*Ketterer* v. *Armour & Co.*, 247 Fed. 921; *Tavani* v. *Swift & Co.*, 262 Penn. St. 184; 105 A. 55.) We adopt that rule in respect to liability for negligence.

The question of liability was submitted to the jury chiefly on the ground that the sale of this pork was in violation of article 17 of the Agriculture and Markets Law relating to " Adulteration, Packing, and Branding of Food and Food Products," and in particular sections 198 and 199. These relate chiefly to the sale of food which is adulterated; and the part thereof deemed applicable here is, " Food shall be deemed adulterated * * * 6. If it consists in whole or in part of a filthy, decomposed or putrid animal or vegetable substance, or any portion of an animal unfit for food, whether manufactured or not, or if it is the product of a diseased animal, or one that has died otherwise than by slaughter." In the general sense, pork of this nature was not " adulterated." (*Bourcheix* v. *Willow Brook Dairy, Inc.*, 268 N. Y. 1, 5, 6; *Gimenez* v. *Great Atlantic & Pacific Tea Co.*, 264 id. 390, 395.)

This pork was not a " portion of an animal unfit for food," if the usual process of cooking was followed. So the part of the statute applicable must be " if it is the product of a diseased animal." This pork was not a product of a diseased animal in the ordinary sense of the term. In many cases the bodies of living human beings as well as animals contain parasites of one kind or another, yet the person or the animal may be perfectly healthy by the ordinary standards. " The disease or the infirmity must be so considerable or significant that it would be characterized as disease or infirmity in the common speech of men." (*Silverstein* v. *Metropolitan Life Ins. Co.*, 254 N. Y. 81, 84.) Disease is commonly known as some ailment that disturbs and deranges some of the vital functions or of an organ, causing a morbid physical condition, or that affects the ordinary

health of a person; and " in its natural and probable development it may be expected to be a source of mischief." (*Silverstein Case, supra.*) As to the animal, the disease had probably run its course, and the parasites had become innocuous, encysted in the muscles, until awakened into new activity and life in another field. The animal itself was not diseased, in the common definition of the term. It lived and was active, with nothing indicating that it was anything but normal. Neither man nor animal is considered diseased because, at one period, there was an acute ailment from which recovery was to all appearances complete, though the body may still contain parasites or bacilli, harmless to the host, but possibly dangerous to others if again they became loose.

These prohibitory statutes require strict obedience; and their violation ordinarily imposes liability for the damages that may follow as a proximate result of such violation. (*Willy* v. *Mulledy,* 78 N. Y. 310; *Amberg* v. *Kinley,* 214 id. 531.) So it is with violations of the Agriculture and Markets Law. (*Abounader* v. *Strohmeyer & Arpe Co.,* 243 N. Y. 458; *Pine Grove Poultry Farm* v. *Newtown B.-P. Mfg. Co.,* 248 id. 293; *Gimenez* v. *Great Atlantic & Pacific Tea Co.,* 264 id. 390.) In those cases the violation was either willful or the results could have been prevented by the exercise of reasonable care. As has been stated, no amount of reasonable care could have detected the existence of these parasites in the pork that was sold by this defendant. It was not intended by the statute to require of those engaged in legitimate trade something impossible of performance in the ordinary conduct of business carried on extensively according to prevailing and accepted standards. There could be no " adulteration " of food under the circumstances here shown. The intent of the Legislature was to prevent the sale of animals known to be diseased, as the term is commonly understood, or where the disease could be discovered by inspection or by the methods commonly used in manufacture.

So it has been held in the courts of the State of Michigan (*Cheli* v. *Cudahy Bros. Co.,* 267 Mich. 690; 255 N. W. 414); and also by the Appellate Division of the First Department (*Siebert* v. *Bose,* 243 App. Div. 692). While the latter is a memorandum decision, the record shows that the same question was presented as is presented here; and the complaint against the packer was dismissed on the trial. An entirely different situation was presented in this court in *McSpedon* v. *Kunz* (245 App. Div. 824).*

The conclusion at which we arrive is that the plaintiffs did not establish the liability of the defendant-appellant either for negli-

---

* Since affirmed by a divided court, 271 N. Y. 131.

gence at common law or under the provisions of the statute. The judgment should be reversed on the law, with costs, and the complaint dismissed, with costs.

CARSWELL, ADEL and TAYLOR, JJ., concur; YOUNG, J., dissents and votes to affirm on the ground that the liability of the appellant for violation of the statute is absolute and does not depend upon the reasonable possibility of discovery.

Judgment reversed on the law, with costs, and complaint dismissed, with costs.

