**LEONARDI et, Plaintiffs-Appellants v. HABERMANN PROVISION COMPANY, Defendant-Appellee.**

Ohio Appeals, Eighth District, Cuyahoga County.

Nos. 19224, 19225, 19226, 19229, 19230, 19231.   Decided July 6, 1943.

254

Harrison & Marshman, Cleveland, for plaintiffs-appellants.
McKeehan, Merrick, Arter & Stewart, Cleveland, for defendant-appellee.

## OPINION

By SKEEL, J.

The six plaintiffs whose cases were, by the agreement of the parties, tried together, filed their separate actions against the defendant for damages, each claiming to have been poisoned, by eating pork purchased from the defendant.

One of the plaintiffs, Ben Sanguedolce, testified that he went to the Central Market in Cleveland and bought a few pounds of pork shoulder from defendant's meat stand (Stand No. 9). He claims to have taken this meat to his mother-in-law, Mrs. Leonardi, also a plaintiff in one of the actions, who made the pork into sausages and then prepared them for the family Sunday dinner. All six of the plaintiffs became ill, after eating of the sausage, some to a greater degree than others but all cases were diagnosed as trichinosis. There is also some evidence in the record that when the Health Superintendent made an analysis of some of the remaining sausage, the presence of "trichinae larvae" was established in a part of that which remained.

The evidence is in conflict on most of the essential elements of plaintiffs' case. The issue as to whether or not the defendant sold the pork which is claimed to have contained trichinae larvae was not without doubt. The fact that in all six cases illness followed within a few hours after eating some of the home-made sausage while the almost undisputed evidence of the medical authorities is that several days ordinarily has to elapse after eating pork containing trichinae larvae for the infection to develop in the human body, is at least some evidence that the pork which is claimed to have injured the plaintiffs was bought before that which it is claimed was purchased from the defendant.

Plaintiffs introduced the evidence of the method of cooking the sausage meat by boiling it in olive oil and water. But the presence of the trichinae larvae in the sausage thereafter, when the undisputed medical testimony is that trichinae larvae is destroyed when the meat in which it has imbedded itself is heated to a temperature of 137 degrees fahrenheit, is, we believe, under the law, a circumstance that would justify a finding that the direct and proximate cause of the injury of all the plaintiffs was the negligence of Mrs. Leonardi in failing to cook the meat properly. But if that is not true then it would at least be strong evidence of contributory negligence on Mrs. Leonardi's part in her case against the defendant.

The evidence in the record about trichinae, its detectability by examination and inspection and also the manner of its destruction is complete and not in conflict. The Federal and State governments do not attempt to discover the presence of trichinae larvae in meat certified as fit for human consumption, because, to make such an examination would necessitate the complete destruction of the meat. The larvae is completely destroyed in two ways: (1) by cooking when the meat is heated to a temperature of 137 degrees temperature, fahrenheit, and (2) by freezing the meat and keeping it at or below a temperature of 5 degrees fahrenheit for a period of twenty days. When either of these processes is used the product resulting is not fresh pork. The foregoing facts which are clearly brought out without contradiction, in the record, point to the inescapable conclusion that dealers in meat products cannot with any degree of certainty certify against the presence of trichinae in absolutely fresh pork.

The plaintiffs all found their respective actions on the claim that the selling of fresh pork in which trichinae larvae is imbedded is a violation of the Pure Food laws of Ohio and that such violation has the legal result of making the defendant guilty of negligence per se, as to anyone injured by the use of such meat.

The sections of the General Code referred to are §5779 and §12760. They provide as follows:

"Section 5778: Adulterated food, drink, confectionary or condiment; definition. Food, drink, confectionary or condiments are adulterated within the meaning of this chapter * * * (5) if it consists wholly, or in part of a diseased, decomposed, putrid, infected, tainted or rotten animal or vegetable substance or article, whether manufactured or not * * *."

"Section 12760: Selling, etc. unwholesome provisions. Whoever sells, offers for sale or has in possession with intent to sell, disease, corrupted, adulterated or unwholesome provisions without making the condition thereof known to the buyer shall be fined not more than fifty dollars or imprisoned twenty days, or both."

In the absence of any decisions of Ohio courts directly in point, on the rule of law involved, the answer to the question presented must be one of first impression. It will be well to look to the reported cases in other jurisdictions for any help that they may be able to give.

In Michigan the exact question was before the Supreme Court in 1934 in the case of Cheli v Cudahy, 225 N. W. 414. The plaintiff, as administrator of the estate of his decesaed wife, brought an action against John Schenderle, a meat dealer, in Iron Mountain City and Cudahy Brothers Company, a Wisconsin corporation. It was claimed that Mrs. Cheli contracted trichinosis as a result of the infection of uncooked sausage prepared from raw pork purchased from the defendant meat dealer who purchased it from the defendant corporation. On page 415 of the opinion the court says:

"The testimony shows that there is no practical or feasible method of determining whether hogs are infected with trichinae. The bacteria can be detected only by microscopic inspection of the entire carcass of the animal, although the organism is generally found in the muscles.

Until 1906 it was the practice of the government to make such examinations but this practice was finally discontinued because it was found to be ineffective. The only known treatments generally effective in killing trichinae are (1) freezing for 20 days at a temperature of not higher than five degrees fahrenheit; (2) raising the temperature of the meat to 170 degrees fahrenheit momentarily or (3) a prescribed curing process. All of these processes, although effective, remove from the meat in a degree, the quality of freshness demanded by the public. None of these methods were used by the appellant in its preparation of fresh pork but the evidence shows that all the ordinary, usual and reasonable precautions taken by the meat packing industry were observed in the instant case."

"Act No. 193 of the Public Acts of 1895 as amended, Par. 5425 to 5442, inclusive, C. L. 1929, prohibits the sale of adulterated foods and Sec. 5427 includes diseased or tainted meats within this classification. Appellee contends that a violation of this statute is negligence per se To give the statute such force in this case would in effect impose upon the manufacturer the liability of an insurer, regardless of the unusual nature of the use to which its products are put, if the testimony of Dr. A. Behonke is to be taken as true."

"The witness, a graduate veterinarian has served in the Bureau of Animal Industry of the United States Department of Agriculture for over 35 years. He testified that:

" 'The microscopic examination of hog carcasses for trichina with a microscope is not effective. That it is the fact that one may find trichina in the muscles are usually so infected is no guaranty that the rest of the carcass is free from trichina. And it is impracticable to make a complete microscopic inspection for trichina of the entire

carcass * * *. There is no way of detecting trichina or making an inspection so that a statement can be made that the entire carcass is free from trichina.'"

"While this court has held that the statutes imposing criminal liability upon those selling adulterated foods regardless of the absence of proof of criminal intent, or guilty knowledge, People v Snowberger, 113 Mich. 86, 71 N. W. 497, 67 Am. St. Rep. 449, we cannot hold that the legislature intended to impose upon the producer the absolute responsibility of an insurer. In cases where every reasonable means designed to guarantee the safety of food for normal use had been employed."

It must be conceded that there is much to be said for the interpretation of the Pure Food Statutes that they do not require the impossible of those who come within their provisions. Such construction does not weaken the protection which the legislature intended to afford the public and does produce a source of reasonable security in the interests of both the buyer and the seller of food products. That the statute would have application to food products when used in a normal way is not questioned but certainly the protection of the statute should not be extended to the attempted use of food products in unusual or abnormal ways. Pork is not intended to be consumed as food in its raw state. To do so has always been known to be accompanied with great danger. The Rabbinical Law as recorded in the Old Testament prohibited the use of pork for human consumption and designated it as "unclean" because of the same circumstances that caused the plaintiffs injury in the instant case.

This interpretation of Pure Food Statutes with relation to whether or not fresh pork containing trichinae is unwholesome, is supported by the following authorities: Feinstein v Reeves, Inc. (1933) 14 F. Supp. 167. Here the plaintiff claimed to have become ill from eating pork chops infected with trichinae. In holding the defendant not liable the court said on page 167:

"The evidence clearly shows that trichinae infected pork is wholesome and fit for food when properly cooked. Pork chops are not sold to be eaten in the raw state. The warranty of wholesomeness is, not that the pork is free from trichinae, but rather that it is fit for food when properly cooked."

The court on page 168 concluded that pork containing trichinae is not diseased within the meaning of the New York Pure Food Statutes and stated the rule as follows:

"The second alleged cause of action of each plaintiff, while sounded in negligence, is really based upon the Agricultural and Markets Law of the State of New York (Consol. Laws, p. 69). This law (Sec. 198 et seq.) forbids the sale of adulterated foods and the statute states that any food is adulterated which shall consist of

any portion of a diseased animal or of an animal unfit for food. Plaintiffs contend that pork infected with live trichinae is both 'unfit for food' and the 'product of a diseased animal' within the meaning of the law; and that any person selling the same for food even in an uncooked state, is liable."

"When this law was passed, the makers well knew that the parasite trichinae was present in considerable percentage of otherwise healthy hogs; that its presence could not be detected by any known practical method of inspection; that pork so infected was wholesome when cooked; that the United States and State governments made no attempt to inspect for trichinae and made no restriction against its sale for food when cooked. In view of these facts I cannot hold that it is the intent of the statute to include hogs infected with trichinae under the classifications 'diseased animals' or 'unfit for food.'"

Similiarly in Zorger v Hillman's (1936) 287 Ill. App. 357, 4 N. E. (2nd) 900, the court held:

"Pure food statute does not forbid sale of pork containing trichinae but wholesomeness required by statute is that pork be fit for food when properly cooked."

Plaintiff in the above case asserted that she ate pork chops bought at the defendant's store and developed trichinosis. The pork chops, according to plaintiff's evidence, were well done over a high gas flame. Plaintiff claimed that since the Illinois statute "forbids selling any flesh of any diseased animal" defendant was liable. The court, sustaining a verdict returned for the defendant, pointed out that "the jury could not properly have brought in any other verdict," and said (page 901):

"The use for which pork is purchased is to eat it cooked, not raw. A number of cases in other jurisdictions involved the scientific facts relating to trichinae and these decisions support our views that pork chops are not sold to be eaten raw, and that the wholesomeness required by our Pure Food Statute means that pork is fit for food when properly cooked."

In Dressler v Merkel, Inc. (1936) 284 N. Y. Supp. 697, plaintiff bought pork sausage, contracted trichinae and sued the wholesaler "on the ground of negligence" for violation of the New York statute, and the retailer "on the theory of warranty." (Page 699) The court said:

"We will accept as established by the evidence and by the verdict that the pork sold by Merkel, Inc., to Ehring and by him manufactured into these sausages, contained the parasite known as 'trichinae spiralis' and that the plaintiffs became ill after eating

the sausages, of the ailment known as 'trichinosis' or 'trichiniasis' and each suffered somewhat serious consequences."

The New York Act relied upon, provided (page 701):

"Food shall be deemed adulterated * * * (6) if it consists in whole or in part of a filthy, decomposed or putrid animal or vegetable substance, or any portion of an animal unfit for food, whether manufactured or not, or if it is the product of a diseased animal, or one that has died otherwise than by slaughter."

The court held that "plaintiffs did not establish the liability of the defendant appellant either for negligence at common law or under the provisions of the statute," reversed the judgment and dismissed the complaint.

The court said (page 702):

"These prohibitory statutes require strict obedience; and their violation ordinarily imposes liability for the damages that may follow as a proximate result of such violation * * *. As has been stated, no amount of reasonable care could have detected the existence of these parasites in the pork that was sold by this defendant. It was not intended by the statute to require of those engaged in legitimate trade something impossible of performance, in the ordinary conduct of business carried on extensively according to prevailing and accepted standards. There could be no 'adulteration' of food under the circumstances here shown. The intent of the legislature was to prevent the sale of animals known to be diseased, as the term is commonly understood, or where the disease could be discovered by inspection or by the methods commonly used in manufacture."

This conclusion the court rested on the fact (page 700):

"that proper cooking is the only practical way of destroying this parasite; that all pork which is sold in interstate shipment is inspected by the United States Government as was the pork in this case; and that in the ordinary course of business the government inspectors or the packers do not make inspection for the parasite of trichinae, for there is no way to make such inspection except microscopically. Inspection for trichinae efficiently is not possible, for in order to discover these parasites which may be found anywhere in the body of the pork. it would require miscroscopic inspection of practically every fiber. Such inspection, if conducted so as to examine 75% of the muscles, would not be conclusive, but each muscle would have to be examined microscopically. In fact the only way to discover the presence of these parasites would be to grind up the whole pork product and examine each part with a microscope. The

United States Government does not undertake to make any such inspection and does not permit any certification of the presence or absence of trichinae in the hog that is being transported from one state to another or sold by packers or wholesale dealers."

This case was affirmed without opinion by the Court of Appeals in 272 N. Y. 574.

It may be that some doubt might be evidenced as to the authority of the Dressler case supra by the holding of the New York Appellate Division in the case of Catalanello v Cudahy Packing Co., 27 N. Y. Supp. 637. But the facts in the latter case involved the sale of pork products prepared by the manufacturer for human consumption without further cooking. It is perfectly clear that if the seller assumes to prepare pork for immediate consumption so that it is intended to be used without further cooking, if it is processed in a negligent manner so that trichinosis results from its use, the manufacturer would be liable either because of negligence or breach of warranty or for a violation of the Pure Food Statutes. And those who as retailers sell such negligently prepared food to the retail trade must be held liable either because of breach of warranty or for a violation of the Pure Food Statutes, to any person damaged by the proper use of such food.

Plaintiffs cite the case of McSpedon v Kunz, 271 N. Y. 131. This case was decided by a divided court, six months before the Dressler case, supra. Judge Lehmann wrote a dissenting opinion which was concurred in by Judge O'Brien in which he cites with approval the case of Cheli v Cudahy Brothers, supra. It is interesting to note that in the trial of the Dressler case the McSpedon case was not mentioned even though the cases involved almost the identical question.

Perhaps a word should be said about the holding of the Federal Court of Appeals for the Sixth Circuit in the case of Troietto v S. H. Hammond Co. (1940), 110 Fed. (2nd) 135. The Circuit Court attempted to follow the case of Allen v Marvin, 46 Weekly Law Bulletin (Ohio) 208, where the Circuit Court of Ohio did in fact hold as contended for by these plaintiffs. But the Supreme Court of Ohio reversed the Circuit Court and affirmed the trial court in 64 Oh St 608. The Federal Circuit Court decision in the Troietto case therefore is not supported by the Ohio case law.

Concluding therefore that under a proper construction of the §§5778 and 12760 GC, such sections are not violated by the selling of raw pork which contains trichinae, we now give consideration to the sole question upon which the plaintiffs found their respective appeals and that is, was the trial court in error in refusing their requests to instruct the jury before argument as follows:

"I say to you that under the laws of Ohio it is unlawful to sell meat which is unwholesome or diseased; and if you find that the defendant sold meat to Ben Sanguedolce which was unwholesome or diseased by reason of the presence of trichinae, that was negligence as a matter of law; and that would be true irrespective of any Federal rules or inspections and also irrespective of the state or city inspections and also irrespective of the question as to whether the defendant did know or could know that the meat contained such trichinae parasites."

Certainly if our conclusions as to the interpretation to be given §5778 and §12760, supra, is correct it would have been highly prejudicial to the defendant's rights and the court was correct in refusing to give the charge as requested by the plaintiffs.

We further find that the court was correct in refusing to give the charge requested on the ground that it assumed the truth of a fact which was in dispute and was therefore a jury question. The charge in part was:

"* * * irrespective of the question as to whether the defendant did know that the meat contained such trichinae parasites."

The jury might understand this language to mean that the pork claimed to have been purchased from defendant did contain trichinae.

It is claimed by plaintiffs that the words near the beginning of the charge: "If you find * * *" is intended to ask the question for the jury to answer as to the presence of trichinae in the pork. If this be so it would be better to find clearer language to express the thought. In framing charges on questions of law to be given to the jury before argument, absolute correctness is the rule by which they must be judged and for the slightest inaccuracy they must be disregarded. For the reasons thus given the ruling of the trial court is affirmed.

MORGAN, P. J., and LIEGHLEY, J., concur.

MORGAN, P. J. (concurring):

The plaintiffs-appellants in these cases base their claim for reversal on a single assignment of error, namely, the refusal of the court to give the following charge before argument, as requested by plaintiffs-appellants:

"I says to you that under the laws of Ohio it is unlawful to sell meat which is unwholesome or diseased; and if you find that the defendant sold meat to Ben Sanguedolce which was unwholesome or diseased by reason of the presence of trichinae, that was negligence as a matter of law. * * . *"

The above requested charge, in my opinion, is ambiguous. It may mean that it leaves to the jury as a question of fact to determine whether trichinae were present in the meat and whether their presence rendered the meat unwholesome and diseased. On the other hand, the jury may well have understood the charge to mean, had it been given, that if the meat contained trichinae, to any extent, it would be unwholesome and diseased, as a matter of law; that the court was submitting to the jury only the question of fact whether there were any trichinae in the meat.

It is my opinion that it would have been error for the court to charge that the mere presence of trichinae in meat rendered it unwholesome and diseased as a matter of law and it equally would have been error for the court to give a charge which was so ambiguous that the jury might have so understood it. But whether it would have been error so to charge or not, the fact remains that a charge, which when read in one way tells the jury that the question is one of law, and when read in another, tells the jury that the question is one of fact for it to decide, is ambiguous and is therefore properly refused.

Furthermore, however read, the requested charge is not in accord with the theory on which these cases were tried. The gravamen of the claim of the plaintiffs in these cases is not just that there were trichinae in the meat but rather that they were present in the meat in such a condition and to such an extent that by eating the meat one would likely acquire the disease of trichinosis.

The petitions were prepared in accord with this view. They allege that "said pork so sold by the defendant was diseased and unfit for human use or consumption in this, to-wit: that it contained the larvae of trichinosis and was likely to cause said disease of trichinosis in any person eating thereof."

Likewise, in the brief filed by plaintiffs appellants in this court, it is stated:

"If the meat was filled with trichinae parasites, which were likely to poison the person eating the meat, its sale would violate the Ohio law, and would be negligence as a matter of law."

In the special charge requested by plaintiffs-appellants before argument, the element that the presence of trichinae in the meat "was likely to cause said disease of trichinosis in any person eating thereof" as alleged in the petitions, and that "the meat was filled with trichinae parasites which were likely to poison the person eating the meat" was not included. The charge as requested was incomplete and would have tended, if given, to confuse the jury.

The plaintiffs-appellants have no fault to find with the general charge of the court. We deem it right that in judging the correctness of a special charge the refusal of which is the only error claimed by plaintiffs-appellants, the charge should be a "clear, con-

cise or complete proposition of law in concrete form applicable to the issues in this case," and also, that the charge should not be such as "would tend to confuse and mislead rather than aid and instruct the jury." See **Scott v Hy-grade Food Products Corporation, 131 Oh St 225.**

Inasmuch as the requested charge does not meet these tests, it was not error for the court to refuse to give it.