498 P.2d 1359

Billy GARRETT and John D. Garrett, his father, natural guardian, and next friend, and John D. Garrett, Plaintiffs-Appellants,

v.

NISSEN CORPORATION, an Iowa Corporation, Defendant-Appellee.

No. 9380.

Supreme Court of New Mexico.

June 30, 1972.

Rehearing Denied July 24, 1972.

Second Rehearing Denied Aug. 8, 1972.

James L. Brown, John F. Loehr, Farmington, for appellants.

Rodey, Dickason, Sloan, Akin & Robb, Bruce D. Hall, Albuquerque, for appellee.

## OPINION

OMAN, Justice.

This cause was certified to this Court by the New Mexico Court of Appeals pursuant to § 16–7–14(C) (2), N.M.S.A. 1953 (Repl.Vol. 4, 1970). Plaintiffs appeal from a summary judgment entered in favor of defendant. We affirm.

Plaintiffs sought from defendant, as the manufacturer of a trampoline, recovery of damages allegedly resulting from grave

injuries sustained by plaintiff, Billy Garrett, on the trampoline. Billy was a senior in high school on April 12, 1965, the day he was injured. The trampoline belonged to and had been used by the school for almost four years in its physical education and athletic programs, and particularly in the development of its gymnastic teams.

Billy became interested in gymnastics while in the eighth grade and over the years had developed into a skilled tumbler. He was a member of the school gymnastics team, had participated in six or seven meets, and had won medals in the State Gymnastics Meet for his skills in tumbling, free exercise and performance on the side horse. He worked on all types of gymnastic equipment such as the rings, parallel bars, horizontal bar, still rings, side horse, long horse and the trampoline. He began using the trampoline while still in junior high school and used it primarily in physical education classes and as an aid in perfecting his tumbling maneuvers.

The basic maneuvers of rebound tumbling are similar to ground tumbling maneuvers, and Billy learned to perform the basic maneuvers on the trampoline with the purpose in mind of simulating the maneuvers in his ground tumbling. He had been bouncing on the trampoline for four years. Although he had not engaged in competition as a performer on the trampoline, he had above average ability in its use and was advanced in the use thereof far beyond what was taught in the normal physical education classes. In addition to the basic drops, he performed such maneuvers as a front flip (somersault), a back flip, a double back flip, a back flip with a full twist, a front flip with a half twist, and a one-and-three-quarter front flip. He had performed a one-and-three-quarter front flip about 20 times and had always completed it successfully. He performed it two or three times successfully on the date of the accident, but on his third or fourth try he failed to complete the maneuver and landed

on his head on the trampoline mat or bed. This failure on his part was not occasioned by any defect in the trampoline or its capacity to properly propel him to the height required to safely perform the maneuver, but was occasioned by his failure in one or more of the following particulars: (1) failure to achieve sufficient height before undertaking to perform the maneuver; (2) failure to remain in the tucked position long enough to complete the maneuver; or (3) failure to tumble or rotate with sufficient speed to complete the maneuver.

Plaintiffs relied upon 9 separately stated points for reversal in their brief in chief filed with the Court of Appeals. In their supplemental brief filed in this Court, they have consolidated some of their points, have sought reliance upon Williamson v. Smith, 83 N.M. 336, 491 P.2d 1147 (1971), and have attacked the decision in Stang v. Hertz Corporation, 83 N.M. 217, 490 P.2d 475 (Ct.App.1971).

This Court in Stang v. Hertz, No. 9324, 83 N.M. 730, 497 P.2d 732, opinion issued May 26, 1972, reversed the decision of the New Mexico Court of Appeals in Stang v. Hertz Corporation, 83 N.M. 217, 490 P.2d 475, supra, upon the issue of "strict tort liability." The rule enunciated in the Restatement (Second) of Torts § 402A (1965), as extended in our opinion in Stang v. Hertz, No. 9324, supra, is now the law in New Mexico. Thus, plaintiffs' several points relating to this issue of "strict tort liability" have been answered and are no longer of concern in this appeal.

In their supplemental brief filed in this court, plaintiffs stated "[t]he case at bar also was decided at the trial level on the basis that Billy Garrett had 'assumed the risk' as a matter of law. It follows, then, as night the day, that the summary judgment against him cannot be upheld."

This statement is predicated upon our holding in Williamson v. Smith, supra, that, for the reasons stated in the opinion, "assumption of risk will no longer be a defense in New Mexico."

We disagree with plaintiffs' contention that the summary judgment was granted on the basis of the assumption of the risk by Billy. The trial court entered two summary judgments. An appeal to the New Mexico Court of Appeals from the first was dismissed. Thereupon the second was entered, and the appeal now before us is from this second summary judgment. In this second summary judgment the only pertinent finding was "[t]hat there are no genuine issues as to any material fact . . . and the defendant, Nissen Corporation, is entitled to Judgment as a matter of law." This is all that was required of the trial court under Rule 56(c), Rules of Civil Procedure for the District Courts of the State of New Mexico [§ 21–1–1 (56) (c), N.M.S.A.1953 (Repl.Vol. 4, 1970)]. Wilson v. Albuquerque Board of Realtors, 81 N.M. 657, 472 P.2d 371 (1970).

It is true in the original summary judgment the district court made "Findings of Fact" and "Conclusions of Law" as the basis for the summary judgment. The finding of fact and the conclusion of law suggestive of the position asserted by plaintiffs were:

"1. Plaintiff Billy Garrett was fully and indisputably aware of the risk involved in using a trampoline without supervision."

"1. There is no genuine issue of fact on plaintiff Billy Garrett's full awareness of the risk involved in using a trampoline without supervision."

■ We do not read this finding and conclusion as support for plaintiffs' position that the district court entered the summary judgment on the basis of Billy's assumption of the risk. However, even if we were to concede the quoted finding and conclusion supported the position of plaintiffs, we are not bound thereby. We do not know why the district court made findings and conclusions in the first but not in the second summary judgment. The court may have been endeavoring to comply with that portion of the decision in

Wilson v. Albuquerque Board of Realtors, supra, wherein we stated:

"[I]n involved cases where the reason for the summary judgment is not otherwise clearly apparent from the record, the trial court should state its reasons for granting it in a separate opinion or in a recital in the judgment. * * *"

■ We no longer adhere to this position, and the decision of this court in Wilson v. Albuquerque Board of Realtors, supra, insofar as it required the trial court to state reasons for granting a summary judgment in greater detail than as provided in Rule 56(c), supra, is hereby overruled.

We do, however, agree with the trial court that Billy was fully aware of the risks involved in using the trampoline without supervision. He fully appreciated the danger involved if he should fail to complete the maneuver and land on his head. He testified as follows concerning his ability to perform the maneuver and his appreciation of the danger if he should fail to properly complete it:

"Q. What happened then?

"A. Well, the first thing I thought of, almost instantly I knew what had happened because I knew Tim Siefred earlier—about a year before—had broken his neck and we had gotten to be pretty good friends * * *.

"* * *

"Q. In looking back, is there anything that you can think of that you could have done different or do you have any idea?

"A. I just didn't get enough height, or didn't stay in my tuck long enough. Something like that.

"Q. When you say not in your tuck long enough, this is when you are doubled over in the embryo position, I guess, and you might have come out of that too early?

"A. Yes, sir.

"*   *   *

"Q. Have you ever done that particular maneuver before, Billy?

"A. Yes, sir. Several times.

"Q. Had you ever been coached in that maneuver?

"A. Yes, sir.

"Q. Who had coached you in that maneuver?

"A. Bob Smith and Coach Bailey.

"Q. Had you received any special instructions from any of these people and particularly from Coach Bailey about things to watch for and be careful of when performing this maneuver?

"A. Not particularly. Just to always be sure to get the height and to carry through the trick once you start it.

"Q. What height were they talking about?

"A. It all depended on the person and what they feel is sufficient.

"*   *   *

"Q. What did you figure you had to get?

"A. Eight to ten feet.

"*   *   *

"Q. Do you have any idea how many times you had accomplished that maneuver prior to this accident?

"A. Oh, probably 20 times.

"*   *   *

"Q. Did you encounter any kind of problem in doing this?

"A. Not that I can think of.

"*   *   *

"Q. Had you at any time during the some 20 times that you had performed this maneuver landed incorrectly or improperly?

"A. None that I can think of.

"*   *   *

"Q. Okay. Billy, do you know of any condition or—I guess the best word would be any condition of the trampoline itself which in any way contributed to this accident?

"A. No, sir.

"*   *   *

"Q. Now, so far as I understand, you had done this maneuver, this particular trick, the one and three-quarter front somersault with a tuck, on occasions when Coach Bailey had been present?

"A. Yes.

"Q. Were you doing it any different this time than when you had done it when he was present?

"A. I don't think so.

"Q. So, his absence didn't make any difference so far as the manner in which you were performing the trick?

"A. I don't think so.

"*   *   *

"Q. Were you aware that there were any possible dangers in using a trampoline?   *   *   *   *

"A. Well, I had heard of Brian Sternberg, the pole vaulter, I had heard of him, but I don't know anything else other than he was on a trampoline and broke his neck.

"*   *   *

"Q. In doing any trick where you are suspended over the surface, there is a danger or risk of striking the surface before the maneuver is completed, isn't there?

"A. Yes, sir.

"*   *   *

"Q. And in striking the surface, there is always the danger of injury?

"A. Yes, sir.

"Q. And these are things you appreciated in performing these things where you were suspending yourself?

"A. Yes, sir.

"Q. Now, this particular maneuver that you were doing at the time you were injured, the one-and-three-quarter front somersault, as I understand it from your previous testimony that was a maneuver you had done, I think it was estimated, approximately twenty times prior to this particular time when you were injured?

"A. Yes. ' I had done it several times.

" * * *

"Q. All right. Then you recognized that, in performing on the trampoline, there was involved the risk of landing in some manner other than what you intended?

"A. Yes, sir.

"Q. And that, depending on what type of maneuver you were doing, the risk was there that you might, for instance, land on your back, let's say, when you intended to land on your feet? Is that true?

"A. That's right.

"Q. And, likewise, the risk of landing, say, on your head when you intended to land on your back?

"A. Yes, sir.

"Q. And this is particularly so in a maneuver where you have the so-called blind landing involved?

"A. Yes, sir.

" * * *

"Q. Did you, as a result of your knowledge of the difference in the surfaces—that is, the hard surface or the mat surface in tumbling, which has no give, as compared to the trampoline—take any less precaution in using the trampoline than you did with tumbling?

"A. No.

"Q. You treated the surface of the trampoline with the same precaution and the same carefulness that you treated the solid surface of the floor?

"A. Yes, sir.

" * * *

"Q. Did you, in performing that maneuver, realize or recognize or appreciate that a slight variation in height or rotation would expose you to the possibility of landing on your head? Did you recognize that the trick must be done properly—in other words, proper height, proper tuck, proper rotation—in order to prevent landing on your head?

"A. Yes.

" * * *

"Q. * * * * Did you realize in performing that maneuver, the one-and-three-quarter forward somersault, that there was the risk involved of landing on your head?

"A. Yes."

The question then is what duty, if any, rested on defendant to warn Billy of the dangers involved in performing maneuvers on the trampoline, and particularly the one-and-three-quarter front somersault. As above shown, and as conceded by plaintiffs, there was no defect in the trampoline itself. The sole basis upon which plaintiffs seek to impose liability on defendant is their claim that defendant marketed a defective trampoline in that there was not displayed on the mat or bed thereof, or in some other conspicuous place thereon, a sign warning of the dangers of suffering a paralyzing spinal cord injury if you should land with sufficient force on your head on the mat or bed. If there was no duty to warn, then there was no defect, and, consequently, no right of recovery in plaintiffs. Brown v. General Motors Corporation, 355 F.2d 814 (4th Cir. 1966).

It is fundamental that plaintiffs cannot recover if defendant was not at fault, and fault in this case was dependent upon a duty by defendant to warn Billy of danger. See Markwell v. General Tire and Rubber Company, 367 F.2d 748 (7th Cir. 1966); Fanning v. LeMay, 38 Ill.2d 209, 230 N.E.

2d 182 (1967); Perry v. Color Tile of New Mexico, 81 N.M. 143, 464 P.2d 562 (Ct.App.1970).

■ There is no duty to warn of dangers actually known to the user of a product, regardless of whether the duty rests in negligence under § 388 Restatement (Second) of Torts (1965) or on strict tort liability under § 402A Restatement (Second) of Torts, supra. See Industria E. Commercio De Minerios v. Nova Genuesis Societa, 310 F.2d 811 (4th Cir. 1962); Oakes v. Geigy Agricultural Chemicals, 272 Cal.App.2d 645, 77 Cal. Rptr. 709 (1969); Villanueva v. Nowlin, 77 N.M. 174, 420 P.2d 764 (1966); Noel, Products Defective Because of Inadequate Directions or · Warnings, 23 S.W. L.J. 256, 272 (1969); Epstein, Products Liability: Defenses Based on Plaintiff's Conduct, 1968 Utah L.Rev. 267; Prosser, The Fall of the Citadel (Strict Liability to the Consumer), 50 Minn.L.Rev. 791, 838, 839 (1966); Dillard and Hart, Product Liability: Directions for Use and the Duty to Warn, 41 Va.L.Rev. 145, 163 (1955).

■ We need not in the present case contribute to the confusion as to whether the defenses of contributory negligence and assumption of risk are available to a defendant under "strict tort liability," since it appears obvious to us that under the circumstances in this case there was no duty on defendant to warn Billy of dangers in using the trampoline. Our position is that the circumstances here raise no question as to assumption of risk as a defense, since the sense in which this principle would be applicable to the facts here is that of the primary sense in which it is sometimes used as noted in Williamson v. Smith, supra, and which is that defendant owed no duty to Billy. Thus, there is no validity to planitiffs' contention that our holding in Williamson v. Smith, supra, concerning the unavailability hereafter of the defense of assumption of risk, compels a reversal of the summary judgment.

There being no duty on the part of defendant to warn Billy, it follows that the summary judgment was properly entered and should be affirmed.

It is so ordered.

COMPTON, C. J., and McMANUS, J., concur.