134 N.J. Super. 328 (1975)
340 A.2d 687
ERIC HOLLINGER, FRANK HOLLINGER, MONIKA HOLLINGER, HEIDE HOLLINGER, INFANTS BY THEIR GUARDIAN AD LITEM FRANK HOLLINGER, FRANK HOLLINGER, INDIVIDUALLY, AND GISELA HOLLINGER AND FRANK HOLLINGER, HER HUSBAND, PLAINTIFFS,
v.
SHOPPERS PARADISE OF NEW JERSEY, INC., JOHN WINDISH TRADING AS WINDISH PORK STORE, AND DUBUQUE PACKING COMPANY, DEFENDANTS.
Superior Court of New Jersey, Law Division.
Decided March 24, 1975.
Supplemental Opinion May 13, 1975.
*332 Mr. James D. Opfer, Jr. for plaintiffs (Messrs. Cohn & Lifland, attorneys).
Mr. Thomas J. Osborne, Jr. for defendant Shoppers Paradise of New Jersey, Inc. (Messrs. Vaccaro, Osborne & Curran, attorneys).
Mr. Arnold L. Stadtmauer for defendant John Windish trading as Windish Pork Store (Messrs. Celentano & Stadtmauer, attorneys).
Mr. Peter S. Patuto for defendant Dubuque Packing Co.
ROSENBERG, J.S.C.
This matter involves various claims for damages suffered by plaintiffs when they allegedly contracted trichinosis from pork sold by defendant Shoppers Paradise of New Jersey, Inc.[1] Trial was held on March *333 18 to 24, 1975. At the close of plaintiffs' case Shoppers Paradise moved for involuntary dismissal of the claims against it under R. 4:37-2(b), upon which motion the court reserved decision. At the conclusion of its case Shoppers Paradise renewed its application for involuntary dismissal and defendants Windish and Dubuque Packing Co. moved under R. 4:37-2(c) to dismiss the claims for contribution asserted against them by Shoppers Paradise. After argument all motions for dismissal were granted. An order of dismissal as to all defendants encompassing these rulings was entered on April 7, 1975. Plaintiffs appeal this order in a notice of appeal served April 28, 1975. This supplemental opinion is filed in response to that notice pursuant to R. 2:5-1(b) to aid the appellate court in its determinations.
The principal facts of this case do not appear to be in dispute. On October 9, 1971 Mrs. Hollinger purchased a raw pork roast, which was sliced into a quantity of pork chops, at the Shoppers Paradise store located at Route 46 in Fairfield, New Jersey. Some of these chops were prepared by Mrs. Hollinger and consumed by her, her husband and their four children on October 10, 1971. Within sometime thereafter (the precise period is unclear) all the family members experienced some muscle pain, nausea and diarrhea; in the case of Mrs. Hollinger the symptoms were aggravated and included chest pains, heavy perspiration, skin rash and swelling of various parts of the body. This led to her hospitalization, where it was determined that she suffered from a parasitic infection diagnosed as trichinosis. Both Mr. Hollinger and the children were tested for this condition, with the results indicating no trace of the disease in Mr. Hollinger but mild cases in the children; at present, with the exception of muscle pain in one of the children, there is no indication of either the symptoms of the illness *334 or the presence of trichinae parasites in Mr. Hollinger or the children. Although her condition has improved, Mrs. Hollinger still complains of muscle aches, chest pains, headaches and a spotting of the skin. Blood tests indicate that she continues to suffer from trichinosis.
An understanding of the nature and characteristics of the disease is helpful in analyzing the issues raised in this case. Under Evid. R. 9(2)(e) the court takes judicial notice of facts contained in two United States Department of Agriculture (U.S.D.A.) publications: "Facts About Trichinosis," Agriculture Research Bulletin ARS 91-72 (April 1969), and "Trichinosis," Leaflet No. 428, U.S.D.A. (revised September 1968). The disease is caused by parasitic worms called trichinae (Trichinella spiralis) and may infect humans eating raw or under-cooked pork in which the parasite is encysted. On ingestion of contaminated meat the parasites travel into the intestinal tract where they reproduce and move through the bloodstream to invade the voluntary muscles, growing and eventually becoming encysted therein. When the parasites reach the intestines they may cause upset stomach, vomiting, diarrhea and other symptoms of intestinal disorder. During the period of migration and encystment the host may have muscular pain, rising fever, headaches and prostration. When the larvae reach the muscles, swelling of the face and other parts of the body, sore eyes, hemorrhaging under the skin, sore throat, headache, fever and difficulty in breathing commonly are experienced. After encystment these symptoms gradually may disappear although muscle stiffness can linger in severe cases. Most patients suffering from the disease recover with proper treatment.
Stringent control over the feeding of hogs and meat inspection procedures which assure that pork used in products customarily eaten without further cooking has been treated so as to kill trichinae have helped reduce the extent of the disease from an estimated incidence of about 16% of the population during the 1930's and early 1940's to approximately *335 4 to 5% in recent years. Despite these gains in disease control, there is no completely effective method for detecting trichinae in raw pork. As a result the U.S.D.A. does not require inspection of unprocessed meat sold for human consumption. However, it is a known scientific fact that heating raw pork above a temperature of 137° will destroy the parasite and render the meat safe to eat. Thorough cooking is the only means of insuring that raw pork is completely free of trichinae.
It is against this background that defendant's motion for involuntary dismissal is considered. R. 4:37-2(b) provides that dismissal should be granted if "upon the facts and upon the law the plaintiff has shown no right to relief." Although the court is bound to accept as true all evidence of the party opposing the motion and give him the benefit of all legitimate inferences to be deduced therefrom, Dolson v. Anastasia, 55 N.J. 2, 5 (1969), the fact remains that plaintiff must make out a sufficient case upon the law as well as the facts to get to the jury. As the following discussion indicates, it is the opinion of this court that the Hollingers have failed to establish their right to relief as a matter of law and the motion of Shoppers Paradise for dismissal therefore is properly granted.
The first three counts of the amended complaint reflect the grounds upon which plaintiffs seek to predicate liability. Count one appears to rely upon a theory of strict liability in tort, alleging that Shoppers Paradise is liable for damages resulting from the sale of impure and unwholesome meat; count two asserts that Shoppers Paradise breached warranties of fitness of the product sold; count three sounds in negligence and recites that the defendant carelessly put into the stream of commerce meat which caused plaintiffs injury. The single operative element underlying all these theories of recovery is that the defendant improperly sold a food product which resulted in plaintiffs' illness.
Considering first the third count of the complaint, a review of the evidence indicates that plaintiffs have failed *336 to supply proof of negligence sufficient to overcome defendant's motion. In contrast to recovery under a strict liability or breach of warranty theory, where it is unnecessary to prove acts of negligence on the part of the producer or seller of goods, Santor v. A. & M. Karagheusian, Inc., 44 N.J. 52, 66 (1965), recovery for negligence requires an affirmative showing that defendant deviated from accepted standards of conduct in its actions or failure to act. Sanzari v. Rosenfeld, 34 N.J. 128, 134 (1961); McKinley v. Slenderella Sys. of Camden, N.J., Inc., 63 N.J. Super. 571, 579 (App. Div. 1960). The record is bare of evidence which directly or by inference shows that Shoppers Paradise employees did anything which they should not have done or failed to do something which they should have done in handling the meat purchased by Mrs. Hollinger. Since there is no method for detecting the presence of trichinae in raw pork, failure to so detect the parasite cannot comprise chargeable negligence. Absent even a scintilla of evidence upon which a finding of negligence can be based, count three of the complaint should not reach the jury. R. 4:37-2(b); Dolson v. Anastasia, supra, 55 N.J. at 5.
It should be noted that Shoppers Paradise appears to be in technical violation of our criminal statutes in sale of the pork chops. N.J.S.A. 2A:108-1 provides:
Any person who sells or offers or exposes for sale, the flesh of any animal that has died otherwise than by slaughter, or has been slaughtered while diseased, or any contagious or unwholesome flesh or sells or offers or exposes for sale unwholesome food, drink or liquor, is guilty of a misdemeanor.
Normally, violation of a penal statute may be adduced as evidence of negligence in a civil suit. Horbal v. McNeil, 66 N.J. 99, 103-104 (1974); Ellis v. Caprice, 96 N.J. Super. 539, 553 (App. Div. 1967), certif. den. 50 N.J. 409 (1967); Mattero v. Silverman, 71 N.J. Super. 1, 9 (App. Div. 1961), certif. den. 36 N.J. 305 (1962); Rizzolo v. Pub. Serv. Coord. Transport, 111 N.J.L. 107, 111 (E. & A. 1933). For *337 this rule to apply in the instant case it is necessary to define raw trichinous pork as an "unwholesome food." Although there are no reported cases construing the statute or defining its terms, a majority of jurisdictions hold that raw trichinous pork is not unwholesome within the meaning of pure food statutes. Zorger v. Hillman's, 287 Ill. App. 357, 4 N.E.2d 900 (App. Ct. 1936); Cheli v. Cudahy Bros. Co., 267 Mich. 690, 255 N.W. 414 (Sup. Ct. 1934); Dressler v. Merkel, Inc., 247 App. Div. 300, 284 N.Y.S. 697 (App. Div. 1936), aff'd 272 N.Y. 574, 4 N.E. 2d 744 (Ct. App. 1936); Schneider v. Suhrmann, 8 Utah 2d 35, 327 P.2d 822 (Sup. Ct. 1958); cf. Leonardi v. A. Habermann Provision Co., 143 Ohio St. 623, 56 N.E.2d 232 (Sup. Ct. 1944); see also Frumer & Friedman, Products Liability, § 24.04 (2) (c) (1974); Annotation, "Liability of manufacturer or seller for injury caused by food or food product sold," 77 A.L.R.2d 7, §§ 10(a), 28 (1961). This view recognizes the fact that raw pork is sold for eating only after proper cooking and that the potentially unwholesome condition is completely removed by such preparation; it takes into account both the protective intent of the statute and the unique character of raw pork. For this reason it is held that raw trichinous pork is not "unwholesome food" as the term is used in N.J.S.A. 2A:108-1. Shoppers Paradise thus did not sell "unwholesome food" and is not in violation of the statute.
Counts one and two pose more difficult problems. As noted above, recovery for neither strict liability nor breach of implied warranty of merchantability requires proof of negligence by the defendant. Liability is established if the evidence shows that the product was not reasonably fit for the ordinary purposes for which it was sold and such defect proximately caused injury to the ultimate consumer. Santor v. A. & M. Karagheusian, Inc., supra, 44 N.J. at 66-67; Corbin v. Camden Coca-Cola Bottling Co., 60 N.J. 425, 431 (1972); Scanlon v. General Motors Corp., 65 N.J. *338 582, 591 (1974). It seems clear that these principles are applicable to the retail sale of food products. Simon v. Graham Bakery, 17 N.J. 525 (1955); Newmark v. Gimbel's Inc., 54 N.J. 585, 594 (1969); see also N.J.S.A. 12A:2-314(1); Sofman v. Denham Food Service, Inc., 37 N.J. 304 (1962). Thus, in the instant case, if plaintiffs show that the pork was not reasonably fit for eating when it was sold and that the defect therein caused their injuries, they may recover by reason of either breach of warranty or strict liability theories, which are considered together for purposes of analysis. Newmark v. Gimbel's, Inc., supra, 54 N.J. at 595.
Two reasonable inferences which could be drawn from the sale of the pork chops to Mrs. Hollinger and the subsequent illness of her and her family are that the meat was unfit for consumption and that this unfitness proximately caused plaintiffs' injuries. However, to infer that the product was unfit upon reviewing the consequences of its use is not to say that it was not reasonably fit at the time of sale for its ordinary and intended purpose. Raw pork is a unique product in that it may contain an inherent defect (trichinae) which is undetectable by the seller but curable through preparation by the consumer. The fact that there is a danger of illness as a consequence of eating uncooked or underdone pork is a matter of common knowledge which courts in other jurisdictions have recognized and of which this court takes notice. Evid. R. 9(2) (d); Silverman v. Swift & Co., 141 Conn. 450, 107 A.2d 277 (Sup. Ct. Err. 1954); Meyer v. Greenwood, 125 Ind. App. 288, 124 N.E.2d 870 (App. Ct. 1955); Adams v. Scheib, 408 Pa. 452, 184 A.2d 700 (Sup. Ct. 1962). It follows that the ordinary and intended purpose for raw pork is consumption after proper cooking by the consumer and that if the chops in question were reasonably fit at the time of sale for such use Shoppers Paradise may avoid a finding of strict liability or breach of warranty.
*339 On direct examination Mrs. Hollinger was asked how she cooked the pork chops served on October 10, 1971. Her testimony indicates the method and degree of preparation:
Q. Now, will you tell me exactly in what manner you prepared the pork chops for that day. Explain exactly what you did on Sunday with regard to those pork chops * * *
A. * * * I salted, peppered them put garlic on. And I prepared them and I fried them in a cast-iron skillet * * * I had four pork chops at one time in the skillet which fitted on the bottom, and they were browned on one side. I turned them over, browned the other side for 15 minutes, 10 to 15 minutes approximately, each side. I took them out and then I browned the other three, did the same thing, browned them on both sides * * * in oil * * * then I browned some diced onions. When they were brown, I added the pork chops back into the skillet and added water to cover the pork chops and put a cover on and boiled them for an hour and ten minutes.

* * * * * * * *
Q. What kind of stove do you have?
A. Gas stove.
Q. Gas. How would you describe how the flame was on the stove that day?
A. It was medium.
Q. Was the water bubbling?
A. Yes, it was boiling.
Q. Did the water boil over?
A. No.
Q. Now, at the end of this hour and ten minute period, you say you took the  what did you say? At the end of the hour and ten minutes, what did you do with the pork chops?
A. I tested them first with the fork and they were very nice and tender, and I removed them from the heat and I served them.
Q. When you say you tested them with the fork, what did you do with the fork?
A. I stuck the fork in it and they were beautifully, perfectly cooked because I made pork chops many times before.
Q. When you say "beautifully, perfectly cooked" what was the color inside?
A. It was a gray, whatever, or browned. It was browned. It was brownish, whatever 
Q. Well, was there 

* * * * * * * *
A. Well, the pork chops fell apart. This is how soft they were. How can I  they were browned and I had gravy over it so they were  the pork chops were brown from frying them and with the gravy  with the gravy over it, with the fried onions, so it makes it brownish.
*340 It is apparent that if plaintiffs contracted trichinosis from the pork chops despite this seemingly thorough cooking, all the meat was not exposed to the minimum temperature of 137° F. necessary to destroy the trichinae. This necessarily leads to the question of whether the pork in fact was properly cooked by Mrs. Hollinger before consumption which, in turn, depends on how the term "properly cooked" is defined. A question of first impression in New Jersey, its resolution determines whether Shoppers Paradise might be held liable for sale of a product not reasonably fit for its ordinary and intended purpose.
Although our courts have not previously dealt with this problem, courts in other jurisdictions have considered situations similar to the one posed here. In Holt v. Mann, 294 Mass. 21, 200 N.E. 403 (Sup. Jud. Ct. 1936), plaintiff contracted trichinosis from eating ham. The court determined that whether the meat was properly cooked was a jury question and the standard to which the consumer should be held is one of "ordinary household cooking." 294 Mass. at 24, 200 N.E. at 405. It went on to express its reasoning:
* * * It is true according to the evidence, that trichinae are killed by exposure to heat of one hundred thirty-seven degrees Fahrenheit. But in ordinary household cooking it is not easy to be sure that every part of a ham will be heated to so high a degree. It could have been found that the ham was cooked as thoroughly as could be expected in a family, but without killing trichinae with which it was infested. The ham could have been found not "reasonably fit" for the purpose for which it was bought. [294 Mass. at 24, 200 N.E. at 405]
This approach was reaffirmed in Massachusetts in Arena v. John P. Squire Co., 321 Mass. 423, 73 N.E.2d 836 (Sup. Jud. Ct. 1947), and adopted in Connecticut, Silverman v. Swift & Co., supra, 141 Conn. 450, 107 A.2d 277; Indiana, Meyer v. Greenwood, supra, 125 Ind. App. 288, 124 N.E.2d 870; Maryland, Vaccarino v. Cozzubo, 181 Md. 614, 31 A.2d 316 (1943); and Pennsylvania, Adams v. Schieb, supra, 408 Pa. 452, 184 A.2d 700.
*341 The so-called `Massachusetts rule' expressed above has been explicitly rejected in two jurisdictions. Illinois' courts have held that proper cooking of raw pork means that the meat has been heated to the temperature of 137° F. Zorger v. Hillman's, supra, 287 Ill. App. 357, 4 N.E.2d 900; Nicketta v. National Tea Co., 338 Ill. App. 159, 87 N.E.2d 30 (App. Ct. 1949). Language used by the court in Nicketta is particularly expressive of the Illinois view:
* * * Plaintiffs allege that the only obligation which exists between a purchaser of fresh pork and a retail seller is that there is an implied warranty that the pork will be fit, wholesome and proper for human consumption after proper cooking. They also allege that they purchased the pork from the defendant; that it was properly cooked; that they ate it; and that they acquired or became infested with trichinosis. They alleged a factual impossibility, a fact irrefutable by a well established scientific rule, of which it was the duty of the trial court to take judicial notice, namely, that a human being cannot acquire trichinosis from eating pork which has been properly cooked. [338 Ill. App. at 168, 87 N.E.2d at 34]
See also, Golaris v. Jewel Tea Co., 22 F.R.D. 16 (D.C.N.D. Ill. 1958). This same position was endorsed by the Supreme Judicial Court of Maine in Kobeckis v. Budzko, Me., 225 A.2d 418 (1967):
The phrases "ordinary domestic cooking," etc., cited above are no real guide in the cooking of pork and pork products as a premise upon which to found a complaint for breach of implied warranty. As of this date, authoritative sources are uniform in saying that raising the pork or pork product to a temperature of 137° Fahrenheit kills trichinae and "proper" cooking as used in this case means raising the temperature throughout the meat or meat product to a minimum of 137° Fahrenheit. [Me., 225 A.2d at 424]
A necessary implication to be drawn from this approach is that a consumer who prepares raw pork for consumption and thereafter contracts trichinosis from it has not properly cooked the meat. Since the product thus cannot be shown to be unfit for its ordinary and intended purpose, i.e. eating after proper cooking, recovery for breach of warranty (or *342 strict liability) is impossible. See Frumer & Friedman, supra, § 25.04(2).
It is the view of this court that as between these two rules the latter is the more sound. To require proper cooking of raw pork by the consumer to eliminate trichinae and then to hold that such cooking need not in fact make the meat safe is anomalous; if not a "factual impossibility," as observed in Nicketta, supra, this approach at least invites an illogical result. An even more compelling reason for adopting the minority rule is that it is compatible with the doctrine of strict liability developed by our courts.
Since the landmark case of Henningsen v. Bloomfield Motors, Inc., 32 N.J. 358 (1960), New Jersey has been in the forefront of jurisdictions extending protection to consumers by imposing strict liability in tort. The doctrine expressly has been extended to the manufacturer and/or seller of automobiles, Henningsen, supra; Scanlon v. Gen. Motors Corp., supra, 65 N.J. 582; Moraca v. Ford Motor Co., 66 N.J. 454 (1975); motorcycles, Sabloff v. Yamaha Motor Co., Ltd; 113 N.J. Super. 279 (App. Div. 1971), aff'd 59 N.J. 365 (1971); carpeting, Santor v. A. & M. Karagheusian, Inc., supra, 44 N.J. 52; grinding discs, Jakubowski v. Minn. Mining & Manufacturing, 80 N.J. Super. 184 (App. Div. 1963), rev'd on other grounds, 42 N.J. 177 (1964); mass-produced houses, Schipper v. Levitt & Sons, Inc., 44 N.J. 70 (1965); cafeteria food, Sofman v. Denham Food Service, Inc., supra, 37 N.J. 304; a power punch press, Bexiga v. Havir Mfg. Corp., 60 N.J. 402 (1972); Finnegan v. Havir Mfg. Corp., 60 N.J. 413 (1972); carbonated beverage bottles, Corbin v. Camden Coca-Cola Bottling Co., supra, 60 N.J. 425; permanent hair wave solution, Newmark v. Gimbel's Inc., supra, 54 N.J. 585; and water meters, Rosenau v. New Brunswick, etc., 51 N.J. 130 (1968); it also applies to lessors of rented motor vehicles and trailers, Cintrone v. Hertz Truck Leasing, etc., 45 N.J. 434 (1965); Ettin v. Ava Truck Leasing, Inc., 53 N.J. 463 (1969). Recovery is based on considerations of policy *343 rather than actionable conduct by the defendant. These considerations are identified in Cintrone, supra:
* * * Warranties of fitness are regarded by law as an incident of a transaction because one party to the relationship is in a better position than the other to know and control the condition of the chattel transferred and to distribute the losses which may occur because of a dangerous condition the chattel possesses. These factors make it likely that the party acquiring possession of the article will assume it is in a safe condition for use and therefore refrain from taking precautionary measures himself. 2 Harper & James, Torts, § 28.19 (1956). * * * [45 N.J. at 446; emphasis supplied]
In the case of raw pork the factual premise upon which the first policy consideration rests is not present. Because of the character of the product it is impossible for the seller to detect the presence of the latent defect. In this sense the situation is analogous to that posed by the presence of serum hepatitis in whole blood. In the recent case of Brody v. Overlook Hosp., 127 N.J. Super. 331 (App. Div. 1974), aff'd 66 N.J. 448 (1975), the court was unwilling to impose strict liability upon a blood bank for the death of plaintiff's decedent cause by a transfusion of blood containing hepatitis. The decision was based largely on the fact that no method existed whereby the blood could be tested for serum hepatitis virus prior to transfusion. Id. at 336. The same result was reached in Jackson v. Muhlenberg Hosp., 96 N.J. Super. 314 (Law Div. 1967), rev'd on other grounds, 53 N.J. 138 (1969), where it was concluded that "The unavoidable presence of hepatitis virus in the blood furnished does not give rise to strict liability for the resultant harm." Id. at 333 (emphasis supplied). Shoppers Paradise is in much the same position as to the trichinous pork chops as Overlook and Muhlenberg Hospitals were as to the contaminated blood; as in the blood cases the policy justification is not here present upon which strict liability may be predicated.
One significant way in which this case is distinguishable from the blood cases is that here a cure exists for *344 the latent defect in the product. In both Jackson and Brody the court found support for the nonapplication of strict liability in Restatement, Torts 2d, § 402 A, comment (k), dealing with "unavoidable unsafe products," which are characterized as "products which, in the present state of human knowledge, are quite incapable of being made safe for their intended use. * * *" The courts endorsed the reasoning of the Restatement in concluding that blood properly prepared and accompanied by proper directions and warnings is not unreasonably dangerous in light of its utility, and the seller therefore "is not to be held to strict liability for unfortunate consequences attending their [sic] use, merely because he has undertaken to supply the public with an apparently useful and desirable product, attended with a known but apparently reasonable risk." Restatement, supra; Brody v. Overlook, supra, 127 N.J. Super. at 339. Since the presence of trichinae in raw pork can be cured but only by the consumer, the rationale for absolving the helpless seller from strict liability for damages caused by the parasite is even more compelling than in the case of a product where no cure is known. To put it another way, where the user of the product is contributorily negligent for failing to make the product safe, the seller should not be held to a strict liability standard. Contributory negligence is a good defense to strict liability unless considerations of policy and justice make it inapplicable. Bexiga v. Havir Mfg. Corp., supra, 60 N.J. at 412; Cintrone v. Hertz Truck Leasing, etc., supra, 45 N.J. at 457-459; Ettin v. Ava Truck Leasing, Inc., supra, 53 N.J. at 471-474; Maiorino v. Weco Products Co., 45 N.J. 570 (1965). Here, because of the unique character of raw pork, considerations of policy and justice compel a finding of contributory negligence as a matter of law. Since the inherent danger in uncooked or underdone pork is a fact of common knowledge chargeable to the consumer, he can neither assume that the seller has taken action to cure the *345 defect nor avoid responsibility for failing to take such action himself.
The other policy ground upon which the cases base strict liability is one of "risk distribution" which suggests that the seller should bear the cost of damages arising from the product because he is better able to spread the risks by procuring liability insurance or impleading other potentially culpable parties (manufacturer, wholesaler, distributor, etc.). Such a rationale is arbitrary in that it fails to account for the specific characteristics of the product in question and the relationship between the particular consumer and seller from which the action for strict liability arises. For this reason the "loss spreading" theory has been given relatively little weight when compared to other policy considerations; "it plays `only the part of a make weight argument' * * *," Magrine v. Krasnica, 94 N.J. Super. 228, 239 (Cty. Ct. 1967); Brody v. Overlook Hosp., supra, 127 N.J. Super. at 341. In light of the more compelling considerations of knowledge and curability of the defect discussed above, the "risk distribution" theory does not provide a sufficient basis upon which to hold the defendant strictly liable.
For the foregoing reasons it is the opinion of the court that the policies compelling application of strict liability are not applicable in the case of a consumer contracting trichinosis from pork chops. This is consistent with the holding that Mrs. Hollinger failed to properly cook the meat served on October 10, 1971 and leads to the conclusion that plaintiffs have failed to prove as a matter of law that defendant sold a product not reasonably fit for its ordinary and intended purpose. For these reasons the motion of Shoppers Paradise for dismissal of the complaint is granted.
NOTES
[1] In their complaint plaintiffs assert claims against defendants Windish and Dubuque Packing Co. for damages allegedly caused from bacon packed by Dubuque and sold to Mr. Hollinger by Windish. These claims were dismissed on motion for summary judgment in an order dated May 17, 1974 and thus were not before the court for trial and therefore are not addressed in this opinion.