559 P.2d 1074

Karl-Heinz SCHELLER, Administrator of the Estate of Gertraud Scheller, Deceased, and Karl-Heinz Scheller, Individually, Appellant,

v.

WILSON CERTIFIED FOODS, INC., an Arizona Corporation, Appellee.

No. 1 CA–CIV 2706.

Court of Appeals of Arizona, Division 1, Department C.

Dec. 16, 1976.

Rehearing Denied Jan. 12, 1977.

Review Denied Feb. 1, 1977.

Cunningham, Goodson & Tiffany, Ltd. by James P. Cunningham, Phoenix, for appellant.

O'Connor, Cavanagh, Anderson, Westover, Killingsworth & Beshears by Richard J. Woods, Steven D. Smith, Phoenix, for appellee.

## OPINION

HAIRE, Chief Judge.

This case presents an issue of first impression in Arizona: whether the doctrine of strict liability should be applied against a defendant wholesale meat packer who sells fresh raw pork containing trichina larvae.

The case was dismissed before trial on defendant's motion for summary judgment, and for the purpose of deciding the correctness of the trial court's decision on that motion the facts are not in dispute.

The appellant, plaintiff in the court below, is Karl-Heinz Scheller, individually and as representative of the estate of his deceased wife. Both Mr. and Mrs. Scheller had become ill with trichinosis,[1] and Mrs. Scheller had died of this disease, after consuming a "smoked butt" purchased from Stanley's Sausages, Inc., a local meat processor-retailer, in July of 1971. Stanley's, (a defendant in the court below, but not a party on this appeal) testified through its owner manager as to its usual method of curing and smoking raw pork to process it into a smoked butt; both Stanley's and the Schellers believed that Stanley's processing of the pork rendered it wholesome and fit to eat without further cooking.[2]

It is not contested that the raw pork from which the butt was made had been sold to Stanley's by Wilson Certified Foods, a wholesale meat packer, after being slaughtered and cut at Wilson's federally inspected plant in Omaha, Nebraska. Federal regulations do not require an inspection for trichina larvae. Prescribed Treatment of Pork, 9 CFR § 318.10 (1976). The pork was neither wrapped nor labelled by Wilson before receipt by Stanley's, nor was it sold to the Schellers wrapped or labelled.

Suit was filed against Wilson and Stanley's Sausages, Inc. based on theories of strict liability and breach of warranty that the meat was reasonably fit for human consumption.[3]

After discovery proceedings, defendant Wilson moved pursuant to Rule 56, Ariz. Rules Civ.Proc., for an order granting summary judgment as to it, on the basis that it had breached no warranty to the Schellers nor was it strictly liable in tort. The trial judge granted this motion and entered judgment in favor of defendant Wilson pursuant to Rule 54(b), expressly stating that there was no just reason for delay and directing entry of judgment. This appeal followed.

■ Although the complaint was framed to impose liability under theories of both breach of warranty and strict liability in tort, on this appeal the plaintiff recognizes that where no express warranty was made to him, his claim must rest on implied warranty. Under the later decisions, the theory of liability under implied warranty has been merged into the doctrine of strict liability in tort, so that it is on this latter doctrine that the plaintiff's claim must stand or fall. See Wetzel v. Commercial Chair Co., 18 Ariz.App. 54, 500 P.2d 314 (1972). It is, therefore, the applicability of the strict liability doctrine which has been pursued by plaintiff and argued on this appeal.

In Arizona the doctrine of strict liability has been specifically adopted as stated in Restatement, Second, Torts, § 402A. O. S. Stapley Co. v. Miller, 103 Ariz. 556, 447 P.2d 248 (1968).

The doctrine of strict liability as stated in Restatement, Second, Torts, § 402A reads:

"(1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if

(a) the seller is engaged in the business of selling such a product, and

1. Trichinosis is a disease caused by eating raw or undercooked pork containing parasitic worms. "FACTS ABOUT TRICHINOSIS", 3, 4, Agricultural Research Service, U. S. Department of Agriculture (April 1969).

2. Stanley's testified through its owner, Stanley Martyka, that in the process of preparing pork shoulder into smoked butt it was his custom to soak the raw pork in brine, dry it, and smoke it until the internal temperature reached 152°. A temperature of 137° is sufficient to kill trichina larvae.

3. Suit was filed against Wilson, Stanley's, and the plaintiff's treating physician. The only references to liability founded on a theory of negligence which appear in the complaints seem to refer only to the malpractice action against the physician.

(b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.

"(2) The rule stated in Subsection (1) applies although

(a) the seller has exercised all possible care in the preparation and sale of his product, and

(b) the user or consumer has not bought the product from or entered into any contractual relation with the seller."

The provisions of § 402A which have particular relevance to plaintiff's claim require that plaintiff show that the fresh raw pork sold by defendant Wilson was in a *defective* condition which was *unreasonably dangerous* to the consumer.

■ The immediate and obvious problem with defining the pork as defective or unreasonably dangerous is that the pork was sold by Wilson, and purchased by both Stanley's and the plaintiff, with the understanding by all concerned that it was to be properly cooked before it was consumed. Not only is it common knowledge that pork is not to be eaten raw, but in addition there was testimony that the Schellers, Stanley's, and Wilson all knew that in order to kill any trichina larvae and eliminate the danger of trichinosis, pork products had to be cooked thoroughly before they were eaten.

The Comments to § 402A are instructive and helpful in analyzing whether the expected cooking of the pork renders it not defective or unreasonably dangerous in its original condition. Comment *i.* states:

"*i. Unreasonably dangerous.* The rule in this Section applies only where the defective condition of the product makes it unreasonably dangerous to the user or consumer. Many products cannot possibly be made entirely safe for all consumption, and any food or drug necessarily involves some risk of harm, if only from over-consumption. Ordinary sugar is a deadly poison to diabetics, and castor oil found use under Mussolini as an instrument of torture. That is not what is meant by 'unreasonably dangerous' in

this Section. *The article sold must be dangerous to an extent beyond that which would be contemplated by the ordinary consumer who purchases it, with the ordinary knowledge common to the community as to its characteristics.* (Emphasis added).

■ This Comment is indicative that where, as here, the ordinary consumer, with the ordinary knowledge common in the community, would be aware of the danger so as to take steps to eliminate it, the product is not unreasonably dangerous within the contemplation of this section. "Normal consumption" of pork, to the Schellers as to the community in general, meant consumption after proper cooking. Had Wilson sold the raw pork directly to Mrs. Scheller, she would admittedly have cooked the pork to destroy any possible trichinae. Thus we hold that the trichinae infested pork here involved did not fall within the definition of a product "in a defective condition unreasonably dangerous to the user or consumer."

Plaintiff argues that if the pork products in question were violative of federal or state statutes, then liability could be imposed under these statutes and *a fortiori* the products must be considered defective for purposes of imposing strict liability in tort. However, the same analytical problem exists in ascertaining whether the infected pork violates statutory standards.

Federal statutes specifically except raw pork products customarily well cooked in the home or elsewhere from the requirements for treatment to destroy trichinae. The federal statutes relating to Animals and Animal Products, Title 9, Ch. 111, CFR § 318.10 (1976), 35 Fed.Reg.No.193 (October 3, 1970) exempt the fresh pork here:

" § 318.10 Prescribed treatment of pork and products containing pork to destroy trichinae.

"(a) *All forms of fresh pork,* including fresh unsmoked sausage containing pork muscle tissue, and pork such as bacon and jowls, other than those covered by paragraph (b) of this section, *are classed as products that are customarily well cooked*

*in the home or elsewhere before being served to the consumer. Therefore, the treatment of such products for the destruction of trichinae is not required.*

"(b) Products named in this paragraph, and products of the character hereof, containing pork muscle tissue (not including pork hearts, pork stomachs, and pork livers), or the pork muscle tissue which forms an ingredient of such products, shall be effectively heated, refrigerated, or cured to destroy any possible live trichinae, as prescribed in this section at the official establishment where such products are prepared: * * * *fresh or cured boneless pork shoulder butts, hams, loins, shoulders,* shoulder picnics, and similar pork cuts *in casings or other containers in which ready-to-eat delicatessen articles are customarily enclosed* (excepting Scotch-style hams); * * *

(Emphasis added).

■ The plain language of this regulation exempts those raw pork products which are expected to be cooked, such as the pork shoulder in this case, from the requirements of treatment. A fresh boneless pork shoulder butt would be exempt unless sold in a casing or other container in which ready-to-eat items are customarily enclosed. It is undisputed that when Wilson sold the pork shoulder butt to Stanley's it was not in such a container.

We proceed now to a consideration of state statutes relied upon by plaintiff. Whether the sale of the infested raw pork shoulder in question violates our Arizona Adulterated Food Statutes is a matter of first impression in this state.

The applicable statutes in effect during July of 1970 were A.R.S. § 24–637 (1956), dealing with meat:

§ 24–637. Requirements for processed, blended, or prepared meat and meat food products

\* \* \* \* \* \*

"D. Meats and meat food products shall not be adulterated or mis-branded.

and A.R.S. § 36–902 (1956) dealing with adulterated foods generally. Defendant Wilson notes that A.R.S. § 24–639B contained exceptions to the applicability of § 24–637:

"B. Slaughtering or processing establishments operating under the supervision of the United States department of agriculture shall be exempt from those portions of this chapter relating to plant and equipment inspections, ante-mortem and post-mortem inspections and disposal of carcasses, but slaughtering or processing establishments shall comply with the provisions of this chapter relating to licensing fees charged to such establishment as well as the requirements relating to brand inspection."

Wilson argues that under the terms of § 639B the federal inspection of Wilson's plant exempted it from the state adulteration statutes, but in its terms § 639B exempted federally inspected plants only from state inspection requirements. While it is express that the licensing and brand inspection requirements were still applicable, the application of the adulteration section is left in limbo.

■ The statutory sections specifically dealing with food adulteration, A.R.S. § 36–901 *et seq.*, however, contained no exception for federally inspected meat. It seems, then, that federally inspected meat was therefore not meant to be exempt from the purview of Arizona's adulterated food statutes.

As then in effect, § 36–902 defined adulterated foods as follows:

" § 36–902. Adulterated foods; exceptions

A. Food, including potable waters requiring a bacteriological or chemical examination, is adulterated if:

1. A substance has been mixed or packed therewith, reducing or injuriously affecting its quality, purity, strength or food value.

\* \* \* \* \* \*

5. It contains added poisonous or other added deleterious ingredients.

6. It consists wholly or partially of a filthy, decomposed or putrid animal or

vegetable substance, or a portion of an animal or vegetable unfit for food, whether such food is manufactured or not.

7. It is the product of a diseased animal or one that has died other than by slaughter."

Arizona has no case law specifically discussing whether the sale of trichina infested pork violates these statutes. There is case law in other states going both ways, but the majority rule is that pork infested with trichina larvae is not diseased or unwholesome so as to violate statutory standards. 2 Frumer & Friedman, Products Liability § 25.04[2] (1976) states that it is the majority view that raw trichinous pork is not adulterated or diseased within the meaning of pure food statutes. "Wholesomeness" as required is usually found to mean that the product would be fit for consumption after "proper cooking".

Of course, as the treatise observes, if courts will take judicial notice that "proper cooking" destroys trichina larvae, it would be a factual impossibility to establish both that the plaintiff properly cooked the pork in question and that the pork in question caused the plaintiff to suffer trichinosis. See *Nichetta v. National Tea Co.*, 338 Ill. App. 159, 87 N.E.2d 30 (1949); *Hollinger v. Shoppers Paradise of New Jersey, Inc.*, 134 N.J.Super. 328, 340 A.2d 687 (1975).

The *Hollinger* case, *supra*, discusses many of the issues raised in the case at hand. In deciding whether the sale of trichina infested raw pork violated the New Jersey pure food statutes, the court in *Hollinger* stated:

"It should be noted that Shoppers Paradise appears to be in technical violation of our criminal statutes in sale of the pork chops. N.J.S.A. 2A:108–1 provides:

Any person who sells or offers or exposes for sale, the flesh of any animal that has died otherwise than by slaughter, or has been slaughtered while diseased, or any contagious or unwholesome flesh or sells or offers or exposes for sale unwholesome food, drink or liquor, is guilty of a misdemeanor.

Normally, violation of a penal statute may be adduced as evidence of negligence in a civil suit [Citations omitted]. For this rule to apply in the instant case it is necessary to define raw trichinous pork as an 'unwholesome food.' Although there are no reported cases construing the statute or defining its terms, a majority of jurisdictions hold that raw trichinous pork is not unwholesome within the meaning of pure food statutes. *Zorger v. Hillman's*, 287 Ill.App. 357, 4 N.E.2d 900 (App.Ct.1936); *Cheli v. Cudahy Bros. Co.*, 267 Mich. 690, 255 N.W. 414 (Sup.Ct. 1934); *Dressler v. Merkel, Inc.*, 247 App. Div. 300, 284 N.Y.S. 697 (App.Div.1936), aff'd 272 N.Y. 574, 4 N.E.2d 744 (Ct.App. 1936); *Schneider v. Suhrmann*, 8 Utah 2d 35, 327 P.2d 822 (Sup.Ct.1958); cf. *Leonardi v. A. Habermann Provision Co.*, 143 Ohio St. 623, 56 N.E.2d 232 (Sup.Ct.1944); see also, Frumer & Friedman, Products Liability, § 24.04(2)(c) (1974); Annotation, 'Liability of manufacturer or seller for injury caused by food or food product sold,' 77 A.L.R.2d 7, §§ 10(a), 28 (1961). *This view recognizes the fact that raw pork is sold for eating only after proper cooking and that the potentially unwholesome condition is completely removed by such preparation; it takes into account both the protective intent of the statute and the unique character of raw pork. For this reason it is held that raw trichinous pork is not 'unwholesome food' as the term is used in N.J.S.A. 2A:108–1. Shoppers Paradise thus did not sell 'unwholesome food' and is not in violation of the statute.*" 340 A.2d at 691. (Emphasis added.)

In discussing whether the defendant's sale of such pork could be the basis of liability under strict liability or breach of implied warranty theories, the New Jersey court also relied on the fact that it is common knowledge that pork must be properly cooked, so that the infested pork was reasonably fit for its intended use (i. e., after proper cooking) at the time the defendant sold it:

"Counts one and two pose more difficult problems. As noted above, recovery

for neither strict liability nor breach of implied warranty of mechantability [sic] requires proof of negligence by the defendant. Liability is established if the evidence shows that the product was not reasonably fit for the ordinary purposes for which it was sold and such defect proximately caused injury to the ultimate consumer. *Santor v. A. & M. Karagheusian, Inc., supra,* 44 N.J. [52] at 66–67, 207 A.2d 305; *Corbin v. Camden Coca-Cola Bottling Co.,* 60 N.J. 425, 431, 290 A.2d 441 (1972); *Scanlon v. General Motors Corp.,* 65 N.J. 582, 591, 326 A.2d 673 (1974). It seems clear that these principles are applicable to the retail sale of food products. *Simon v. Graham Bakery,* 17 N.J. 525, 111 A.2d 884 (1955); *Newmark v. Gimbel's Inc.,* 54 N.J. 585, 594, 258 A.2d 697 (1969); see also N.J.S.A. 12A:2–314(1); *Sofman v. Denham Food Service, Inc.,* 37 N.J. 304, 181 A.2d 168 (1962). Thus, in the instant case, if plaintiffs show that the pork was not reasonably fit for eating when it was sold and that the defect therein caused their injuries, they may recover by reason of either breach of warranty or strict liability theories, which are considered together for purposes of analysis. *Newmark v. Gimbel's Inc., supra,* 54 N.J. at 595, 258 A.2d 697.

Two reasonable inferences which could be drawn from the sale of the pork chops to Mrs. Hollinger and the subsequent illness of her and her family are that the meat was unfit for consumption and that this unfitness proximately caused plaintiffs' injuries. However, to infer that the product was unfit upon reviewing the consequences of its use is not to say that it was not *reasonably* fit at the time of sale for its ordinary and intended purpose. Raw pork is a unique product in that it may contain an inherent defect (trichinae) which is undetectable by the seller but curable through preparation by the consumer. The fact that there is a danger of illness as a consequence of eating uncooked or underdone pork is a matter of common knowledge which courts in other jurisdictions have recognized and of which this court takes notice. Evid.R. 9(2)(d); *Silverman v. Swift & Co.,* 141 Conn. 450, 107 A.2d 277 (Sup.Ct.Err. 1954); *Meyer v. Greenwood,* 125 Ind.App. 288, 124 N.E.2d 870 (App.Ct.1955); *Adams v. Scheib,* 408 Pa. 452, 184 A.2d 700 (Sup.Ct.1962). It follows that the ordinary and intended purpose for raw pork is consumption after *proper cooking by the consumer* and that if the chops in question were reasonably fit at the time of sale for such use Shoppers Paradise may avoid a finding of strict liability or breach of warranty." Id. at 692, 693.

The New Jersey court reviewed two lines of cases. One, the Massachusetts line, held that the standard of proper cooking to which the consumer should be held was only that of "ordinary household cooking", and whether the meat was properly cooked under this standard was a jury question. The New Jersey court, however, chose to follow the majority of states, finding as a matter of law that:

"... a consumer who prepares raw pork for consumption and thereafter contracts trichinosis from it has not properly cooked the meat. Since the product thus cannot be shown to be unfit for its ordinary and intended purpose, i. e. eating after proper cooking, recovery for breach of warranty (or strict liability) is impossible. See Frumer & Friedman, *supra,* § 25.04(2)." Id. at 694, 695.

Appellant raises the argument that the failure to label the pork as requiring further cooking or to warn the consumer of the danger was in itself a defect rendering the product unreasonably dangerous. While imposing a requirement to provide warnings may be salutary if prescribed prospectively, in the instant case there was testimony that both Stanley's and the Schellers were aware of the potential danger attendant upon eating raw pork. Since Stanley's believed that it had adequately cooked the meat, and the plaintiff relied on Stanley's to have done so, in actual fact the warning would have been a superfluity.

In Annot. Failure to Warn as a Basis of Liability under Doctrine of Strict Liability in Tort, 53 A.L.R.3d 239, 257, § 7, it is observed by the author of the annotation that failure to warn is not considered a defect where the danger is generally known and recognized. *See Garrett v. Nissen Corp.,* 84 N.M. 16, 498 P.2d 1359 (1972). We have testimony in this case that the necessity of cooking pork to protect against the possible presence of trichina larvae is a matter of common knowledge, and more importantly, that the Schellers already had knowledge of this requirement.

An analogy may be drawn to asking a manufacturer to warn of the consequences of not using seat belts. In *Marshall v. Ford Motor Co.,* 446 F.2d 712, 715 (10th Cir. 1971), the court observed:

> "The final argument is that Ford should have warned of the consequences of nonuse of seat belts. In this day and age the function of seat belts is a matter of common knowledge. The plaintiff's evidence shows repeated admonitions by the owner-driver to her passengers, who were members of a car pool and frequently rode with her, that seat belts should be worn.",

and imposed no duty upon the manufacturer to supply a warning.

Appellant also strenuously argues that strict liability should be imposed in this case as a matter of law because modern technology has perfected economical and feasible tests for the presence of trichina larvae.[4] In view of the extensive federal regulation concerning the inspection and treatment of pork products, and especially in light of the specific exception granted for raw pork intended for future cooking from the requirements of treatment for trichinae, it would seem inappropriate for this court to step into this area and impose additional and possibly conflicting inspection or treatment requirements.

We have previously indicated in this opinion our conclusion that plaintiff's complaint did not purport to state a claim in negligence against Wilson. However, even assuming for purposes of discussion that such a claim had been adequately pled, we are still of the opinion that the trial court properly granted Wilson's motion for summary judgment in favor of defendant Wilson.

In order to establish a claim for negligence, plaintiff must show that some action or failure to act on Wilson's part violated a duty owed to plaintiff. We have previously discussed in this opinion all of the grounds on which negligence might be predicated in this case, i. e., whether the failure to warn was a defect, whether a duty to inspect should be imposed, and whether the pork violated a duty imposed by federal and/or state statutory provisions. Simply stated, we have held, as a matter of law, that none of these actions or failure to act by defendant Wilson constituted a breach of any duty owed by Wilson to the plaintiff. No other action or failure to act by defendant Wilson having been alleged in the complaint, there is nothing upon which a breach of duty, and hence a finding of liability in negligence, could be based.

We hold that the trial court properly granted summary judgment in favor of defendant Wilson against the plaintiff.

Affirmed.

NELSON and EUBANK, JJ., concur.

---

4. Plaintiff points to an industry and government sponsored pilot project described in the U.S. Department of Agriculture pamphlet, "Facts about Trichinosis", supra, note 1. This project ended in 1969, and the Department of Agriculture noted that trichinae were present in only .009 percent of animals examined. This is hardly conclusive as to the desirability of imposing the inspection technique, especially where the federal government itself apparently did not decide to do so.